THE SOUTHERN EXPRESS COMPANY, plaintiff in error, *vs.* EDWARD B. PURCELL, defendant in error.

1. When goods are delivered to a common carrier for hire, to be transported by him from one place to another : *Held,* that under the law of this State, no excuse will avail him in case of the loss of the goods, unless it was occasioned by the act of God, or the public enemies of the State, and that he cannot *limit his legal liability* by any notice given, either by publication, or by entry on receipts given for the goods, or tickets sold, but he may make an express contract, independent of his receipt, and will then be governed thereby.

2. When there is evidence of an express contract between the common carrier and the shipper of the goods, outside of the receipt therefor, whereby the shipper was to send a man along with the goods shipped on an open car, with a tarpaulin to cover them, and buckets of water to protect the goods against fire, which the shipper failed to do, and the goods were destroyed by fire : *Held,* that although the common carrier was liable under the law for *negligence,* yet it was a question to be submitted to the jury, whether the goods were destroyed by the negligence of the defendant, or in consequence of the failure of the plaintiff to perform his contract on his part, under the evidence in the case.

Action against common-carrier.    Tried before Judge GIBSON.    Richmond Superior Court.    January Term, 1867.

This was an action by Purcell against the Southern Express Company, a corporation, for the loss of thirty-three bales of cotton, alleged to have been delivered to them as a common-carrier, at Augusta, Georgia, to be taken to Wilmington, North Carolina.

The plaintiff introduced E. W. DOUGHTY, who testified that on the 27th of February, 1864, he sold to plaintiff twenty-eight bales of cotton, classed as good middling to middling fair, weighing in the aggregate 14,243 pounds, at $1.10 per pound, and that it was worth $1.00 per pound on the 9th day of May, 1864. He recognized the bill shown him as the one by which he sold, and it is correct.

Plaintiff then showed by J. B. WILSON, that on the 7th of May, 1864, he was an agent of defendant at Augusta, as such gave the receipt shown him, but did not receive the cotton in person, made out the receipt from data furnished by the tally-book kept at the railroad by defendant's clerk. He knew nothing about the contract nor the cotton, nor whether defendant charged the usual freight.

The receipt was then read to the jury. It was as follows:

"SOUTHERN EXPRESS COMPANY.

AUGUSTA, May 9th, 1864.

Recieved of E. B. Purcell thirty-three bales of cotton, valued at ———— dollars, and for which amount the charges are made by said Company, marked 'R. R. for James Mullen, Wilmington, N. C.,' which it is mutually agreed to be forwarded to our agency nearest or most convenient to destination only, and there delivered to other parties to complete the transportation. It is further agreed, and is part of the consideration of this contract, that the Southern Express Company is not to be held liable or responsible for the property herein mentioned, for any loss or damage arising from the dangers of railroad, ocean, steam, or river navigation, leakage, fire, or from any cause whatever, except the same be proved to have occurred through the fraud or gross negligence of its agents or servants, unless specially insured by it, and so specified in this receipt, which insurance shall constitute the limit of the liability of the Southern Express Company in any event, and if the value of the property above described is not stated by the shipper at the time of shipment, and specified in this receipt, the holder thereof will not demand of the Southern Express Company a sum exceeding fifty

dollars for the loss or detention of, or damage to each package herein receipted for. Nor shall said Company be held responsible for safety of said property after its arrival at its place of destination. All articles of glass or liquids will be taken at shipper's risk only, and the shipper agrees that the said Company shall not be held responsible for any injury or loss by leakage, breakage, or otherwise.

Freight $1,158.50. (Paid.)     *For the Company,*

                 J. B. WILSON."

Plaintiff then examined F. DAMISH, of Branchville, South Carolina. He testified that he was conductor of the train upon the South Carolina Railroad, on the 9th of May, 1864, which carried plaintiff's said cotton from Augusta, Georgia : it was on a flat car, and so far as he knew no special messenger was in charge of the car. The car was No. 1, he took it at Hamburg, South Carolina, and left it at Branchville, South Carolina, on a side track. The tracks were about ten feet apart, and where he left said cotton it was in danger of being burnt by sparks from passing engines. A car of cotton was burnt upon that side line about that time, but he did not know the fate of this cotton. So far as he knew, the car had no protection against fire; no person, other than the train hands, went with the car to protect it, and there were no buckets except those belonging to train. At times the Railroad received cotton on flat cars. There was a watchman in the service of the South Carolina Railroad at Branchville.

E. W. COLE, for plaintiff, testified that he was Superintendent of the Georgia Railroad, and had been for three or four months, that he had been Superintendent of the Nashville and Chattanooga Railroad, and had been Superintendent of railroads for seven years. The rules of railroads require very great care in loading cars with cotton, it is usually put in box-cars. Buckets of water should be carried (when cotton is shipped on platform cars) to extinguish fires. When left at a station, it should be under guard. Left on side line, it is in danger of fire from passing engines.

It was shown that on the 9th of May, 1864, such cotton

was worth in Wilmington 12½ cents in specie. Such was then sold there at that price.

Here the plaintiff closed.

The defendant relied on said receipt as a special contract, and also upon an alleged special oral contract with the Company, by which Purcell agreed to take all risk of transportation on himself, and furnish means for protecting the cotton from fire, and failed to furnish them.

In support of this last ground, the Company offered the following testimony:

SYLVESTER testified that he was then and on the 9th of May, 1864, an employee of defendant. The Company had no box-cars, had two open platform cars. About the 9th of May, 1864, plaintiff had a load of cotton brought from the direction of the Georgia Railroad, on one of the defendant's flat cars to the South Carolina Railroad. Sylvester was sent to Marly, Superintendent of the South Carolina Railroad, to see if he would take it. He refused to receive the cotton unless defendant would send it on one of their cars, cover it with a tarpaulin, and send a man along with it, with buckets of water, to extinguish fire. Sylvester told Shuter, Superintendent of defendant, in the presence of plaintiff and James Mullins, what Marley had said. Plaintiff and Mullen agreed that Mullen should go with the car, and the terms required by Marly should be complied with.

Mullen did not go with the train which took the cotton, nor did he go until the morning after it left. Purcell being a railroad man, defendant took it as an act of accommodation to him, and was to receive only half the usual freights. Purcell gave his due bill for the freight; it has not been paid. Witness thought war existed at the time.

Witness was present when Wilson gave the receipt, he took the memorandum from witness' tally-book which contained the entries made by him from plaintiff's bills. He was told by an employee of defendant, the cotton was burnt; he saw the remains of the car when it was brought back, it was burnt. The car was worth $25,000.00 in Confederate money.

The endorsement at shipper's risk, was only required of goods extra hazardous.

The answers of Samuel Tinsley to interrogatories were read. He was employed in May, 1864, by the South Carolina Railroad Company, as agent at Branchville, South Carolina. During that month a car load of cotton was destroyed there, but his books being lost, he could not give the exact date. It arrived there from Augusta, Georgia, at 8 o'clock, A. M., and was switched off on the Columbia track, i. e. the side line on the Columbia side. It was an open car, a platform car, adapted to the carrying of coal, and was marked, No. 1., Southern Express Company. It was full of bales of cotton. He did not then count them, but the usual load is from thirty-five or forty bales. Its destination was Wilmington, North Carolina, and it was switched off to await the arrival of the train from Charleston to Columbia connecting at Kingsville with the Wilmington and Manchester Road. That train was due at Branchville at 2 o'clock, P. M. The car No. 1 was destroyed by fire at Branchville, about 1 o'clock, P. M., before the arrival of said train from Charleston.

He knew not the origin of the fire. So far as he knew, neither the owner nor any agent for him was in charge of the car, or taking any care of it. The conductor of the train which brought it, turned it over to witness to be sent to Kingsville and there delivered to the Wilmington and Manchester Railroad. Witness saw no other person connected with the car or cotton.

Witness, at the time of trial, was employed by South Carolina Railroad Company, and resided at No. 37, Wolfe steeet, Charleston, South Carolina. In May, 1864, he was the general agent of said Company at Branchville, and had charge of all its interests there, and was subject to call by day or by night. E. M. Gilbert, the assistant superintendent, had a desk at Branchville, and did business there as occasion required; he resided at Orangeburg and his duties took him over the whole road, he left orders with witness, who was the only officer transacting business at Branchville.

The employees of the Company at that place were two watchmen and two carpenters. It was the duty of the watchmen to guard the cars day and night, and of the carpenters to repair cars, etc. Henry Kinsay and —— Carter were the watchmen—Kinsay was on duty at the time. The regular passenger trains, up and down, met at Branchville about 12 o'clock, M., in the day, and the down freight trains from Augusta and from Columbia, met at Branchville about 8 o'clock, A. M., and the up freight trains passed Branchville about 2 o'clock, P. M., in the day, one going to Augusta and the other to Columbia.

He did not recollect the name of the engine nor of the engineer of the train which brought the cotton there. The conductor's name was Frederick. The side track, where the cotton was burnt, was about fifteen or twenty feet from the main track. Witness knew not the origin of the fire, Kinsay discovered it about 1 o'clock, P. M., and reported it to him at the office. He did not know the owner of the cotton, the conductor said it was for Wilmington, North Carolina. ·

In rebuttal the plaintiff was examined. The cotton burnt was that which he bought from Doughty. The contract for shipment was made with Shuter, acting President of the Company, in their back office. No one else was present. Sylvester, Hall and Mullen were at the time in the front office. The cotton was taken for him as a railroad man, the South Carolina Railroad Company having no cars to spare. He went over the river with it; it went down the road by the early train next morning. The contract was not a matter of accommodation, except that the cotton was taken for him as a railroad man with whom the Company exchanges favors.

He did not agree to take the risk; he loaded the cotton in person; this is not usual, though once Mr. Mays, at Camak, the father of the agent there, who lived near the depot, did it. The cotton was partly covered with a tarpaulin belonging to the Georgia Railroad Company. No water was furnished, nor did he agree to furnish any, nor did he agree to send Mullen with the cotton; he went next day to sell it.

Shuter sent Sylvester to see Marly about shipping the

cotton.   Witness had not applied to Marly.   Witness never demanded payment for the loss till Shuter demanded payment of the note for freight.   Witness offered to square off, but Shuter refused ; this was eight or ten months after the loss.   He had been up the Georgia Railroad some months, was back some time before Shuter dunned him on the note.

EDWARD O'DONNELL testified that he was an old railroad conductor, that in carrying cotton in open cars it is necessary to place it at least seven cars from the engine, and that open cars so loaded could not be safely left on sidelings, exposed to passing trains, without a guard and water to put out sparks.

In surrebutter, defendant examined J. W. MEREDITH, who testified that he was an employee of the South Carolina Railroad Company, 9th May, 1864, this cotton came to the depot on a car loaded, and he sent it over to Hamburg that evening and did not see plaintiff go with it.   It was started for Wilmington in the morning.   Freight cars from Augusta to Wilmington always went with the train for Charleston, and were switched off at Branchville to wait for the up train from Charleston for Columbia, which took them to Kingsville. The passenger trains passed while those cars waited there.

Said JOHN E. MARLY testified that Purcell applied to him about the 9th of May, 1864, to take a car load of cotton to Wilmington, he had no cars and declined taking it,—Sylvester afterwards called for the Express Company.   Marly then agreed to take it if defendant would furnish a car, have the cotton covered with a tarpaulin, and send a man with buckets of water to prevent fire.

The Court charged the jury that the receipt shown was not such a special contract as under the laws of Georgia exempted defendant from liability, and that they were liable as common-carriers, unless a special contract or agreement was shown ; and that if the contract was made as testified by Sylvester, it was still incumbent on defendant to prove that there was no negligence by defendant.

The verdict was for plaintiff, for one thousand dollars in specie without interest.

New trial was moved for by defendant on the grounds that the verdict was contrary to the evidence, etc., that the Court erred in charging as aforesaid as to the receipt, and as aforesaid as to the oral contract set up by Sylvester's evidence. The Court held the motion under advisement till June Term, 1867, and then refused a new trial.

The questions made here are those in the said motion.

WILLIAM T. GOULD, WILLIAM DOUGHERTY, for plaintiff in error, made substantially the same points, and quoted the cases cited in Southern Express Company vs. Newby, 36th Ga. R., 642, Q. V.

H. W. HILLIARD, for defendant in error.

Points and cases cited : Defendant is common-carrier, Code, sec. 2039 ; nothing excuses it but act of God or of public enemy, sec. 2039 ; McArthur vs. Sears, 21 Wend. R., 190 ; Alden vs. Gray, 3 Gray, (Mass.,) R., 342 ; their contract is fixed by law, not by agreement, Thurman vs. Wells, 18 Barb., 500 ; 2d Kent's Com., 602 ; as to contracts limiting liability, sec. 2041, Code ; Davidson vs. Graham, 2 Ohio (U. S.) 131, Code, sec. 2039 ; 1 Sm. & Mar., 279 ; Gould vs. Hill, 2 Hill, 623 ; Penn. R. R. Co. vs. McCloskey, 3 Penn., 526 ; Berry *et al.*, vs. Cooper, 28th Ga. R., 543 ; 19th Wend. R., 272 ; Story on B., 318, 459 ; and this case, June Term, 1866 ; and as to the verdict, 28th Ga., 365 ; ib. 484 ; 31st Ga. R., 492, 531.

WARNER, C. J.

This is an action brought against the defendant as a common-carrier for the loss of thirty-three bales of cotton. The errors complained of are, that the Court below refused to grant a new trial upon the several grounds specified in the record. The first assignment of error that we will now consider and decide is, that the Court below erred in charging the jury, " that the receipt offered in evidence was not a special contract binding on the plaintiff." The decision of this question involves the *liability* of a common-carrier in this

State, as well as the *extent* to which he may limit his *legal liability* under the laws thereof.    What is the legal liability of a common-carrier in case of the loss of goods entrusted to him as such, under the laws of this State?    By the 2039th section of the Revised Code, it is declared, that "Any person undertaking to transport goods to another place for a compensation, is a *carrier*, and as such is bound to ordinary diligence."    The 2040th section of the Revised Code declares, that "one who pursues the business constantly, or continuously, for any period of time, or any distance of transportation, is a *common-carrier*, and as such is bound to use *extraordinary diligence*.    In cases of loss, the presumption of law is against him, and *no excuse* avails him, unless it was occasioned by the act of God, or the public enemies of the State."

1. The legal liability of a common-carrier by the laws of this State, therefore, in case of the loss of the goods entrusted to him, is clearly and explicitly defined, and *no excuse* will avail him, unless such loss was occasioned by *the act of God, or the public enemies of the State*.    Thus is the law written, and positively declared, by the supreme power of the State.    We have thus shown what is the *legal liability* of a common-carrier in this State, in case of the loss of the goods.    The next question that presents itself is, how far, to what extent, and in what manner can such common-carrier *limit that liability*, imposed upon him by the law?    It is contended in this case, that the defendant *has* limited his legal liability in his receipt given for the cotton to the plaintiff.    To give such a construction and effect to the receipt, as is contended for, would be to allow the defendant to limit and regulate his legal liability as a common-carrier, in *express contravention of the law*, which imposes it upon him.    The defendant's liability as a common-carrier is regulated by law upon the grounds of public policy, and he cannot be permitted, by *his own act*, to limit the effect and operation of that law, and thereby defeat that public policy.    It was the duty of the defendant, as a common-carrier, to *obey the law* in regard to his liability as such, and not to attempt to *make it*, for his own protection.    But the 2042d section of the Revised Code expressly de-

clares, that " A common-carrier *can not limit his legal liability* by any notice given, either by publication, or by entry on receipts given, or tickets sold. He may make an *express contract*, and will then be governed thereby." The legal liability of a common-carrier, as defined by *the law*, is one thing; his legal liability as a common-carrier, under an *express contract* made with the shipper, is another and quite a different thing. In the latter case, his liability will depend upon the terms of that express contract, and will be governed by it. But such express contract limiting *his legal liability* as a common-carrier, cannot be proved by a notice given, either by publication, or by an entry on the receipt given for the goods, or tickets sold. The express contract made with the shipper of the goods, *limiting the legal liability* of the common-carrier, must be made independently of the receipt given for the goods, and be proved independently thereof, as any other contract is proved, when entered into by two or more parties to it. The common-carrier receipts the shipper for the goods, and *the law* fixes his liability therefor in case of loss; but the common-carrier and the shipper may enter into an express contract, *outside of the receipt given for the goods*, in regard to the carrier's liability, and then, both parties having a *fair opportunity* to understand the terms of the contract, will be governed by it. Such, in our judgment, is a fair and legitimate interpretation of the Code, in relation to the liability of common carriers in this State.

2. The next ground of error assigned upon the record is, that the Court erred in charging the jury " that if the contract was made as testified by the witness Sylvester, it was still incumbent on the defendant to prove, that there was no negligence on their part." The effect of this charge in our judgment, was to exclude from the consideration of the jury the question in dispute, whether the cotton was destroyed by the *negligence* of the defendant, or by *the failure of the* plaintiff to perform his part of the express contract, if they should believe such a contract was made. In view of the facts of this case, as disclosed by the record, we think that the Court below erred, in not charging the jury, in addition to the charge as given, that

if they should believe from the evidence, that there was an express contract made between the plaintiff and defendant outside of, and independent of the receipt given for the cotton, as testified to by the witness Sylvester, and that the cotton was destroyed by fire, in consequence of the failure of said plaintiff to perform said contract on his part, then the defendant was not liable for the loss of the cotton.    It is true that the defendant, as a common-carrier, is liable under the law, for negligence.    Whether the cotton was destroyed by the negligence of the defendant in this case, or by the failure of the plaintiff to perform his contract with the defendant in relation to its transportation (if any such contract was made) is the question for the jury to determine under the evidence, and the charge of the Court upon that point.    Upon this last ground, we reverse the judgment of the Court below and grant a new trial.

Judgment reversed.