C. WALLACE, Superintendent Western and Atlantic Railroad, plaintiff in error, *vs.* JOSEPH R. MATTHEWS, defendant in error.

1. When a party to a suit pending makes an admission, for the purpose of saving the other party the expense and trouble of getting up the evidence on certain points, and afterwards discovers he has, by inadvertance, or mistake, admitted facts which are not true or which it is proper for him to controvert, he may, by notice to the other party withdraw the admission, and put his adversary on proof of the facts: *Provided*, there is sufficient time after the withdrawal of the admission for the preparation of the case, and the other party has not been injured thereby, as by the death of a witness whose testimony would have been taken but for the admission or other like cause.

2. A common carrier cannot dispute the title of the person delivering the goods for shipment by setting up adverse title in himself, or in third persons, which is not being enforced against him.

3. When a person desiring to ship cotton, soon after the termination of the war, when the Western and Atlantic Railroad had but little rolling stock and refused to ship except upon contracts limiting its liability, and the agents of the connecting line, knowing the facts, had the same kind of receipts, containing a contract to limit liability, which were used by the Western and Atlantic Railroad, and said agents were also the agents of the shipper, who procured a blank receipt from them and filled it up himself, and carried it to the depot agent of said road, and got him to sign the receipt as prepared by the shipper, and to ship the cotton: *Held*, that this was an express contract by which the shipper as well as the road is bound, as both parties had a *fair opportunity* to understand its terms, when it was entered into by them, and both acted upon it and agreed to be bound by it.

Evidence. Common-carriers. Before Judge POPE. Fulton Superior Court. May Term, 1869.

On the 11th of November, 1865, the Western and Atlantic Railroad agent received for shipment certain cotton, and gave therefor a receipt, as follows:

" *Western and Atlantic, East Tennessee and Georgia, Virginia and Tennessee, and Orange and Alexandria Railroads.*

THROUGH FREIGHT LINE CONTRACT.

Route by rail as above, and per steamer to New York.

ATLANTA, GA., November 11, 1865.

Received of Elliott & Jarnegan, consigned to Ober, Nanson & Co., New York, the following described packages, in

VOL. XXXIX—40.

apparent good order, (contents and value unknown,) consigned as marked in the margin, to be transported over the line of this road to the Company's station at its terminus, and delivered in like good order to the consignees or owners at said station, or to such company or carriers (if the same are to be forwarded beyond said station) whose line may be considered a part of the route, to the place of destination of said·goods or packages, it being distinctly understood that the responsibility of this Company as a common-carrier shall cease at the station where delivered to such person or carrier; but it guarantees that the rate of freight for the transportation of said packages from Atlanta to New York shall not exceed ten 75–000 dollars per bale and charges advanced by this company : Provided, that no carrier or company forming a part of the line over which said freight is to be transported, will be responsible for damages, or detention at its terminus, or beyond on any part of the line, arising from any accumulation or over-pressure of business, upon the following conditions : The owner or consignee to pay freight or charges as per specified rates upon the goods as they arrive. Time not guaranteed. Freight carried by this Company must be removed from the station during business hours, on the day of its arrival, or it will be stored at the owner's risk and expense, and in the event of its destruction or damage, from any cause while in the depot of the Company, it is agreed that the Company shall not be liable to pay any damage therefor. It is agreed and is a part of the consideration of this contract, that the Company will not be responsible for leakage of liquids, breakage of glass or queensware, the injury or breakage of looking-glasses, glass show-cases, picture-frames, stove-castings or hollow-ware, nor for injury to the hidden contents of packages, nor for the loss of weight or otherwise, of grain and coffee in bags, or rice in tierces, nor for the decay of perishable articles, nor for damages arising to any article caused from the effects of. heat or cold, nor for the loss of nuts in bags, or lemons or oranges in boxes, unless covered by canvass, or loss or damage to goods occasioned by providential causes, or by *fire* from any cause

whatever, while in transit or at stations.    The Company will not be responsible for damage in tobacco, unless it is proved to have accrued during the time of its transit over this road, and of this, notice must be given within thirty hours after the arrival of the same.    Freight to be paid on the weight by the Company's scales.    This Company not responsible for accidents or delays from unavoidable causes.    The responsibility of this Company as carriers to terminate on the delivery of the freight as per this bill of lading to the company whose line may be considered a part of the route to the place of destination of said goods or packages.    In the event of the loss of any property for which the carriers may be responsible under this bill of lading, the value or cost of the same at the point and time of shipment, is to govern the settlement for the same.    And in case of loss or damage of any of the goods named in this bill of lading, for which this Company may be liable, it is agreed and understood that they may have the benefit of any insurance effected by or on account of the owner of said goods.    Flour barrels and all packages subject to unnecessary cooperage, gun-powder and friction matches, not carried.    This receipt to be presented without alteration or erasure.

| No. | ARTICLES. | MARKS. | SAID TO WEIGH. |
|-----|-----------|--------|----------------|
|     | Forty-seven bales of cotton, part in bad order. No. 308. Original. | W. M. N. Y. |  |

B. B. AMOS, Agent,
Per Van Epps."

Twenty-three bales of this cotton were never delivered to Ober, Nanson & Co., and on the 6th of January, 1869, Joseph R. Matthews brought assumpsit against said railroad as a common-carrier, for its value, in one count declaring that it should have delivered it to consignees in New York and did not, and in another that it should have delivered it to the connecting road at Dalton, Georgia, and that it did not.    On the 7th of January, 1869, Campbell Wallace, then Superintendent of said railroad, delivered to plaintiff's attorney a

written admission, signed by him as such Superintendent, as follows:

"With the understanding that I, the defendant, shall have the same right that is hereby given to the plaintiff— to take other testimony in the cause above stated (Joseph R. Matthews vs. C. Wallace, Superintendent Western and Atlantic Railroad—Assumpsit, in Fulton Superior Court,) in order to save expense, trouble and costs of proving the following facts, about which there is no dispute, we hereby admit the same, and will not controvert the truth of them on the trial of said cause; that is to say: We admit the hand-writing of B. B. Amos, agent, to the receipt dated 11th November, 1865; that said forty-seven bales of cotton therein mentioned belonged to said plaintiff; that they were received by said defendant for shipment; that twenty-three bales of the same were destroyed by fire, while in possession of said defendant as a common-carrier; that the said twenty-three bales weighed twelve thousand and twenty-six (12026,) pounds, worth, at Atlanta, on said day, forty-two and 86-100 (42 86-100) cents per pound; that the plaintiff had paid that price for it in cash, to-wit, the sum of five thousand one hundred and fifty-four and 34-100 ($5,154.34) dollars on that day; that it was worth the same amount in Dalton, at the time it ought to have been delivered there, plus the freight to Dalton, which was —— dollars per bale; and further, we admit that a demand for settlement was made in terms of the law, and settlement refused."

The only plea filed was the general issue. Plaintiff obtained a verdict on the 11th November, 1867, for $5,154 34, with interest and cost, and defendant appealed.

On the 25th of December, 1867, defendant's attorneys gave notice to plaintiff's attorneys that said admission "is withdrawn, and hereafter the defendant does not agree thereto," and on the same day, plaintiff's attorneys replied, that they would insist upon said admission "as binding on defendant as evidence," and would object to its withdrawal. On the appeal trial, in June, 1869, plaintiff's attorneys offered in evidence said admissions.

Wallace, sup't, *vs.* Matthews.

Defendant's counsel produced the notice of withdrawal and objected to the admissions as evidence, upon the grounds that they had been withdrawn, and because Wallace had no authority to make such admissions, "he being only agent or trustee." Plaintiff's counsel produced their reply to the notice of withdrawal, and stated in their place, to the Judge, that the admission was made in presence of defendant's counsel (which was not disputed,) and the Court overruled the objection and the admission was read to the jury. Plaintiff's counsel also read in evidence written admissions made by defendant's attorneys, on the 4th of January, 1868, in which they admitted all the facts admitted by Wallace, except that the cotton belonged to plaintiff, that defendant received it for shipment and that twenty-three bales of it were destroyed by fire while in possession of defendant as a common-carrier.

It was shown by the testimony of plaintiff, that he delivered the cotton and took the receipt, that nothing was said to him by the person signing and delivering the receipt about any special contract releasing the defendant from accountability for loss by fire; the loss of the cotton by fire or otherwise was not the subject of conversation; he shipped his cotton in the name of Elliott & Jarnigan, made out this receipt himself in their names, and got it signed by the agent of the defendant; and he testified that the lost cotton was worth $5,464 99, at the date of shipment. As there was no controversy as to the failure of the defendant to deliver said twenty-three bales to the connecting railroad at Dalton, or as to the burning of the cotton, the evidence on these points is not material to an understanding of the opinion. Elliott, of the firm of Elliott & Jarnigan, testified that his firm was engaged in shipping cotton as agents of the East Tennessee and Georgia Railroad and connecting roads, comprising a line from Alexandria, Virginia, to Atlanta, Georgia, and were employed by the Superintendent of the East Tennessee and Georgia Railroad, who was acting as agent of the Virginia route, their duty was to solicit shipments over said route and ship the cotton, and they were paid by the connecting roads

from Alexandria, Virginia, to Dalton, Georgia; that they were not the agents of the owners; that said firm name was used in said receipt because the cotton came to Atlanta, consigned to said firm, and Matthews happened to be in Atlanta, and attended to it himself to prevent delay; that neither witness nor his firm made any contract with defendant to keep defendant harmless from fire, and that his firm refused to ship cotton over said road at the owner's risk. Here plaintiff rested his case.

The defendant's attorney read in evidence another set of interrogatories for plaintiff, in which he testified that the cotton lost cost him forty-three cents per pound, that he had never been paid for it, directly or indirectly; that he consigned much cotton to Ober, Nanson & Co., in 1865, and that they paid the freights on all received by them; that he shipped the said twenty-three bales in person, and the agent of defendant knew no one in the transaction but himself; that Elliott & Jarnigan had no interest in the cotton, and that he used their bill of lading simply because plaintiff had no blanks of his own; he took the receipt knowing nothing of the notice of defendant that cotton would not be received unless it was insured; never heard of such notice nor saw the same before or at the time of said shipment, nor was his attention called to it by any one. · He testified also, that without reference to any such requirements by defendant, his uncle, William Matthews, in whose name the account was kept with Ober, Nanson & Co., and who, with plaintiff, shared in the profits of the cotton bought by plaintiff that season, had said twenty-three bales of cotton endorsed upon his (Williams') open policy with the Pacific Insurance Company; he paid the premium and charged it in his account with plaintiff; that William Matthews had a right under said open policy to have endorsed on it any property in which he, William, had any interest, or in which he was concerned as factor or otherwise. The following statement of said witness was objected to and excluded by the Court: "William Matthews, my uncle, who was a commission merchant residing at that time in the city of St. Louis, Missouri, had an

Wallace, sup't, *vs.* Matthews.

open policy with the Pacific Insurance Company of said city (of which Company said William Matthews was the President) and had the twenty-three bales of cotton in question endorsed on his open policy in said company, for " whom it might concern," as he did all the shipments of cotton which I made that year from the State of Georgia; some time in the month of February, 1867, William Matthews suspended payment, and being indebted to the said Pacific Insurance Company, he, some time in March, A. D. 1867, transferred the claim for the loss of the twenty-three bales of cotton in question to said insurance company, and soon after adjusted the loss of the same with said company ; the amount he so adjusted was $5,750, being the amount for which said twenty-three bales of cotton were insured."

Defendant's attorneys read, in evidence, said receipt given for the cotton, which plaintiff had produced under notice. Defendant's counsel then introduced the interrogatories of Martin H. Dooley, as follows :

" I am now (March 24th, 1868) Roadmaster of the Western and Atlantic Railroad. In November, 1865, I was Roadmaster, Master of Transportation and Paymaster of said road. I held the three last named positions from the 25th of September, 1865, to the 1st of April, 1866. I have held the position of Roadmaster and line of road Paymaster from 1859 until the present time. The rolling stock of said road was in very bad condition in November, 1865. There were few of the cars, scarcely any, but were broken in some way, holes in them, doors off, etc., and the reason of this was the hauling of troops, from the time Johnson's army was at Missionary Ridge, in the fall of 1863, and the hard wearing service under the military authority when refugeeing with them. When Atlanta fell, for about fifteen months, the latter part of which time, from the 10th of May, 1865, they were under the control of the United States military authorities, and no repairs whatever made on them. On the 25th of September, 1865, the road with its equipments was turned over to Col. Robert Baugh, as Superintendent appointed by Provisional Governor, James Johnson. There

was then no money, no shops, or means of any kind to repair the road or its rolling stock, the shops and depots having (all the shops and nearly all the depots) been burned by one army or the other during the previous military operations. From the 25th of September, 1865, to the 11th or 12th of November thereafter, the officers or authorities of the road were wholly unable to make the necessary repairs of the cars so as to make them safe from fire or other casualty. From the facts above given, the rolling stock of the road, including the freight cars, having gotten into such low condition, from causes which the road or its officers or employees could not avoid, and from the want of money, shops, men, or other facilities, I think the state of things mentioned, as to insecurity of freight cars enquired of, as well as other matters relating to insufficient or unreliable equipment, could not have been avoided by the road or its officers or employees, especially at any time prior to the 11th or 12th of November, 1865, or in fact for some months thereafter. A great work like that, when there is such a variety of means required, taking money, men and time to perfect—so great a work cannot be done in a month or other limited time. We commenced the shipment of cotton over the road some time in the month of October of that year (1865.) Can not give the exact day without referring to the books of the road. The demand for shipment of cotton during the months of October and November, and for some time after, was very heavy. Our facilities for shipping cotton were very poor, for the reason above stated. Neither the engines nor cars were safe to ship cotton at the time, and we so informed shippers when applied to, but the road was compelled to take it from the necessity of the times, other roads being in the same condition. I do not know what the cause of the demand for shipment of cotton, whether it was the high price of cotton, or the scarcity of money. It may be in some measure accounted for from the fact that there had been a war and blockade, and the means of transportation closed for some years, and when the opportunity, poor as it was, was again opened, it naturally came forward very freely. The defend-

Wallace, sup't, *vs.* Matthews.

ant was in bad condition for the shipment of cotton, as before stated.   The condition of the road called for caution in the reception of cotton, as well as other freights, more particularly cotton, as more liable to fire, and in the then condition of the cars, more exposed to fire than usual.   The terms upon which cotton was received were that, in addition to the customary requisites as to delivery and payment of freight, the shipper had to endorse on the bill of lading that he had insured his property against fire, and it was the custom of the road and its shipping agents to require compliance with this rule. Elliott & Jarnegan, a firm doing business in Atlanta, were shipping a good deal of cotton at that time.   They shipped for a large number of parties who forwarded through them. They were considered the general forwarding agents for the East Tennessee and Virginia route.   Mr. Elliott was the member of the firm who was giving personal attention principally to this business, Jarnegan acting in it to a less extent. I had a conversation with Elliott shortly after the cotton in question was burned, in which I told him that I would not risk the flat cars by shipping cotton on them, although there was no risk to the road for the cotton, the parties having that insured, but he said he would risk the cotton on flat cars if I would ship it, and insisted on shipping on those cars when others were not to be had, it being understood in this conversation that the risk of the loss of the cotton by fire was on the insurance companies, but I told him the road would lose the cars, and I would let no more go on flat cars. After this he continued to ship whenever box cars could be had, shipping on the terms above mentioned, until the bridges were washed away on the 25th of December.   Made no contract with Elliott & Jarnegan, other than the terms above mentioned for all shippers.   If any special contract was made with them, it was not done by me.   No special agreement with them, except as with all other shippers, requiring them to sign the bill of lading as above stated, that is true so far as I know.   The custom was to give receipts in accordance with said bills of lading and take such receipts, down to the time the bridges were washed away, as above

stated. No other special contract than this that I know of. The best idea that I can give of the kind of receipts, or rather bills of lading, which were at that time accustomed to to be made out and signed by the agent and endorsed by the shipper, and sent forward with the cotton, I present, to be attached to my answer, a form filled out and used in another case, as a specimen, and which came back with a claim for damage, and which is in the form usual at that time."

This exhibit is exactly like the receipt aforesaid, except that the consignee was different, and it was dated 9th of December, 1865, and opposite the signature of B. B. Amos, agent, were these words, "insured by owner in consignee's open policy, No. 1702, for account of John Thomas."

DOOLEY testified, that he did not know that any special contract was made by Elliott & Jarnigan, "unless they signed the bills of lading mentioned; the original bill of lading with the certificate of the party on the back, that he had insured as before stated, was accustomed to be sent forward with the cotton; and he gave no receipts for freight shipped, that was the business of the depot agents or their assistants."

Defendant's attorney read in evidence interrogatories for one of the firm of Ober, Nanson & Co., and several of their business men. OBER testified, that his firm had a general understanding with William Matthews that he would insure for their benefit their interest in all goods by him shipped to them, but that he did not know that any insurance on said lost cotton was paid to any one, or that any policy was taken upon it; that his firm advanced the money with which these twenty-three bales of cotton were bought, to William Matthews, with the understanding that he would consign the cotton to them; that Elliott & Jarnigan were only forwarders, and that plaintiff was only William Matthews' agent, to buy the cotton.

The business men of Ober, Nanson & Co. testified, that Joseph R. Matthews, promised Ober, Nanson & Co., that when he collected the money for the lost cotton he would send it to them, and that the arrangement as to buying cotton was this: Ober, Nanson & Co. advanced money to William

Matthews, with the understanding that he would buy cotton with it and consign it to them, that they would sell it and retain out of the proceeds their advances, commissions, interest, charges, etc.

Defendant's attorney read in evidence answers of the fireman, who testified to the burning of the cotton, and said that four other persons were present at the time, one of whom is dead, another is gone to parts unknown, and the other names, he could not remember.

P. L. MYNATT testified for the defendant that Ober, Nanson & Co., had notified Campbell Wallace, former Superintendent, not to pay Matthews for the cotton, because it belonged to them, Ober, Nanson & Co. This was more than a year ago. Witness was in New York and saw Ober, Nanson & Co. They wished him to sue the defendant for them for the loss of said cotton. He told them that he could not be employed by them, and recommended that they employ N. J. Hammond.

Plaintiff then introduced N. J. HAMMOND, who testified that Joseph R. Matthews employed A. W. Hammond & Son to bring this suit; that Joseph R. Matthews did not claim the exclusive interest in said cotton, but that this suit was progressing for the benefit of all persons interested in the cotton, suit being brought in Joseph R. Matthews' name as the shipper because witness thought it the proper plan; that witness represented also whatever interest the Pacific Insurance Company had in the cotton; that Ober, Nanson & Co. had tried to employ him to sue for them after this suit was brought, but witness suggested that possibly they and Joseph R. Matthews might differ, and that they had better have another attorney. They employed Colonel Hopkins, and when he examined the cause and knew for what purpose it was proceeding, he was satisfied to let the case progress and look to the recovery of it, and so he and witness agreed.

HOPKINS testified that he represented Ober, Nanson & Co., and had agreed, as Mr. Hammond testified, and a recovery here would satisfy their claim. Upon cross-examination, he said he had long before made a demand of settlement from

the Superintendent of the Western and Atlantic Railroad, but had never followed it up.

This was all the evidence. The defendant requested the Judge to charge the jury as follows:

"If the cotton was lost without fault on the part of the road or its employees, because of defects in the cars produced by the war, which no human efforts, skill or foresight could have avoided or remedied, then the defendant is not liable.

"If it appears that the title to the cotton in question is not in the plaintiff, but in somebody else, then the plaintiff cannot recover.

"The statement or stipulation in the receipt, that the insurance was to inure to the benefit of the road, is not a stipulation limiting the liability of a common-carrier, and therefore good and valid.

"If the plaintiff prepared and presented the receipt to the company, he is bound by the stipulations in the receipt, and a loss by fire, without negligence or fault on the part of the carrier, will not fall upon the carrier, if provided against in the receipt."

The Judge refused so to charge the jury, but charged among other things, not excepted to, that if the evidence showed that the defendant received the cotton in question from plaintiff, he could not afterwards dispute the title of plaintiff, or his right to recover, by setting up title to third persons, which is not being enforced against him, but if it was being enforced, then he might dispute plaintiff's title. The jury found for the plaintiff for $5,171 18, with interest, from the third of January, 1867, and costs.

Defendant's counsel moved for a new trial, upon the grounds that the Court erred—first, in not rejecting said admissions of defendant; second, in rejecting said evidence as to insurance; third, fourth, fifth and sixth, in refusing to charge as requested; seventh, in charging as he did, and because the verdict was against evidence, etc., etc. The Court refused a new trial, and that is assigned as error.

SIMPSON and FARROW, P. L. MYNATT, for plaintiff in error, said Western and Atlantic Railroad was not a common-carrier, Irwin's Code, sec. 2042, 23d Ga. R., 436, 37, 240; until the Code common-carriers could limit liability in receipts, 21st Ga. R., 526; Wallace's admissions were not admissible, Irwin's Code, sec. 972, 3731, 15th Ga. R., 357, 1st Phil. on Ev., 373 and note 230, Ib. 225, note p. 376, Ib. 366 of notes; especially after notice of withdrawal, 4 C. & P., (19 E. C. L.,) 166; the evidence of insurance was admissible, 19th How. U. S. R., 317, 13th Metcalf, 99, 17th Mass. 613, to show that plaintiff cannot recover in his own name; the Court should have charged as requested as to defective cars, etc., 34th Ga. R., 335; the charge that title was immaterial was error, Irwin's Code, secs. 3192, 3193, 1st Ch. Plead.; the clause as to assurance was not limiting liability as carrier; plaintiffs preparing receipt makes "special acceptance," 37th Ga. R., 111.

A. W. HAMMOND & SON, for defendant, replied, that Wallace's admissions were admissible, Irwin's Code, secs. 3731, 975, 3734, 12th Ga. R., 179, 11th, 434, 18th, 687, 690, 1st Gr. Ev., sec 186, p. 244, 28th Ga. 317, 36th Ga. R. 669; as to "special acceptance" by carrier, 34th Ga. R., 320, 36th, 532, 37th, 111, 38th, 37th, 519, and notice must be given to shipper, Ang. on L. of C., secs. 247-8; payment of insurance to shipper does not protect carrier, 20th Ga. R., 87, 10th Rich. L. R., 113, 13th Metcalf, 99, 1st Am. R. R. C., 414, 22, N. Y. 355, Ang. on Ins. 111 note, 118 note, 7th Cush. R. I., 16th Wend., 397, 39th Ga., Pope vs. Gerrad; there was no plea but general issue, Irwin's Code, secs. 2806, 2807, 2858, 2861 incl. 295, 3504; the shipper was proper plaintiff, Irwin's Code, secs. 2050, 2162, 3192, Ang. on L. of C., secs. 492-3 *et seq.*, 497, 499, 501, 28th E. C. L. R., 542, 6th How. (U. S.) R., 380, 21st Howard, 289, 5 Burrows, 2680, 1 D. & E. R., 659, 1st John R. 221, 2d Gr. on Ev., sec. 212, Ang. on C., sec. 493, 2 C. M. & R. R., 660; bailee recovers for owner, and having special property owner need not be party, 3 How. U. S. R., 577, Burke vs. Steel,

by this Court, this term; under general issue, objection as to parties, can not be heard, 27th Ga. R. 116.

BROWN, C. J.

1. We see no good reason why the defendant in the Court below, should not have been permitted to withdraw the admissions made by him, simply to save the other party the expense and trouble of getting up the testimony; if it be discovered that they had been made by inadvertance, or mistake, or for any other reason, were not true: *Provided,* there was sufficient time after the withdrawal for the plaintiff to prepare his case for trial. But this would not be permitted if the plaintiff would be injured by anything that occurred while he relied upon the admission, as in case of the death of an important witness, whose testimony he would otherwise have procured, or the like. This ruling is confined to the class of cases now under consideration, and does not apply to admissions made in the ordinary transactions of life which are governed by well known rules of evidence.

2. As Matthews, the plaintiff, delivered the cotton to the Western and Atlantic Railroad, for shipment, the road will not be permitted to dispute his title in this action, by setting up title in third persons, which is not being enforced against it. Revised Code, section 2050.

3. But the important point in the defence set up by the road to this suit, remains to be considered. Was there an express contract entered into between the road and Matthews, the plaintiff, limiting the liability of the road as a common-carrier? After an attentive examination of this record, we are satisfied there was, and that the rights of these parties must be governed by that contract.

Mr. Dooley, an officer of the road, swears in substance, that such was the dilapidated condition of the rolling-stock of the road, growing out of the war, then very recently closed, that with the means that could be commanded within the limited time which had transpired, insecurity of freights shipped on the road could not have been avoided by the road, or its offi-

cers, or employees, and that the work of repair was so great that it could not be done within a month or other limited time.  And in connection with this testimony of Mr. Dooley, it must be remembered that the road had been turned over to the officers of the State, by the military, a very short time before this shipment was made.  Mr. Dooley also testifies, that Elliott & Jarnigan knew the condition of the road and its rolling-stock, and that they were shipping a good deal of cotton at that time.  They shipped for a large number of parties who forwarded through them, and that in a conversation with Elliott a short time after this lot of cotton was burnt, he, Dooley refused to risk the flat cars to ship cotton, although there was no risk to the road for the cotton, the parties having that insured.  Elliott said he would risk the cotton on flat cars, and insisted on shipping on those cars, when others were not to be had, it being understood at the time that the risk of the cotton was on the insurance companies.  But, says Dooley, I told him the road would lose the cars, and I would not let any more go on flat cars.  After this he continued to ship whenever box-cars could be had, etc.

Dooley also annexes to his answers the form of a receipt, or special contract used by the Western and Atlantic Railroad at that time in its shipments, which is a copy of the one used in this case, and a copy of the receipts which Elliott & Jarnigan, as agents of the Tennessee roads, running a through line in connection with the State Road used in their shipments, for persons who sent cotton to them to be shipped over that line.  It is an established fact, therefore, that Elliott & Jarnigan knew the condition of the road, and of its rolling-stock, and knew that its officers refused to make shipments without a contract limiting their liability, and knew that the form of receipt used by the road, and kept by them as agents of the connecting roads, making together with the Western and Atlantic Road the through line, was intended to be used as the evidence of the express contract, limiting the liability of the road as therein specified, and that among other things in case the cotton shipped were burnt on the line of the road, or at its stations, it was not to be liable.

Thus the matter stood as between Elliott & Jarnigan and the road. Let us next enquire what relation Matthews bore to these parties, and what were his means of knowing the facts. Elliott, in his testimony, says, " he thinks that the plaintiff (Matthews) took the receipt in the firm name of Elliott & Jarnigan. Said firm name was used because the cotton came here (to Atlanta) from West Point, consigned to Elliott & Jarnigan, and Matthews happened to be in Atlanta and attended to it himself, to prevent delay."

This shows that Elliott & Jarnigan were not only the agents of the through line of roads, to solicit shipments, and knew the terms upon which cotton was shipped over that line, but they were also the agents of Matthews, the plaintiff, who consigned his cotton to them for shipment, and had it shipped in their name. This is confirmed by Matthews, who swears that all the cotton he shipped by said railroad was shipped in the name of Elliott & Jarnigan. Then there can be no controversy about the fact, that Matthews, by his agents, through whom he shipped his cotton, had notice of the condition of the road, and of the terms on which it received cotton for shipment.

But we are not compelled to rest the case here. ' We have still stronger evidence that Matthews had notice of the condition of affairs, and agreed to the express contract contained in this receipt limiting the liability of the road in case of destruction by fire, etc. He says, in his answers, " I made out the bills of lading myself, in their name (the name of Elliott & Jarnigan, from whom he got the blanks,) and got them signed by the bill-of-lading clerk of the railroad."

I need not multiply quotations from the evidence. Here is an express admission under oath made by the party himself, that he made out the bills of lading and got the agent of the road to sign them. He may in a subsequent examination deny his knowledge of the terms upon which the road was shipping cotton at that time, or of the contents of the receipt, but it cannot avail him. The law charges him with knowledge of the contents of the contract, used by his own agents,

and filled up by himself, and carried by him to the agent of the road for signature.

Upon these facts as already stated, we hold that the receipt in this case was the written evidence of an express contract, between the plaintiff and the road, by which its liability was to be limited as specified in the receipt.

Taking this view of the rights of these parties, it becomes unnecessary to notice the other points made in the bill of exceptions. The matter of insurance as well as the loss by fire, are provided for in the written contract, and the Court and jury on the next trial, will have no difficulty in arriving at a correct conclusion as to the rights and liability of the road under the contract.

It may be proper to remark, that there is a clear distinction between the case made by this record, and the cases of *Purcell, Newby,* and others, against the Southern Express Company, cited in the brief of the counsel for the defendant in error. In no one of those cases was the receipt prepared by the person shipping the goods and tendered to the company for signature. Nor does it appear in any one of them that the shipper did in fact have actual notice of the contents of the receipt given for the goods.

In the *Southern Express Company vs. Purcell,* 37 *Ga.* 103, which may be said to be the most thoroughly considered of the cases referred to, Warner, C. J., says: "The defendant's liability as a common-carrier is regulated by law upon grounds of public policy, and he can not be permitted by *his own act* to limit the effect and operation of that law, and thereby defeat the public policy." Again, he says: "But the common-carrier and the shipper may enter into an express contract, *outside of the receipt given for the goods,* in regard to the carrier's liability, and then both parties having a *fair opportunity* to understand the terms of the contract will be governed by it."

This language fairly construed, in reference to the case made by the record then before the Court, simply means that while the carrier cannot, by any act of *his own,* to which the other party does not consent, limit his liability, the par-

ties may make an express contract for that purpose, and if they both have a *fair opportunity* to understand the terms of the contract entered into, they. are bound by it.

Here both parties had that *fair opportunity*. The carrier did not limit its liability by its *own act* alone, but by the consent of the shipper. Nobody was entrapped or deceived. The shipper made out such written contract as he was satisfied with, and carried it to the agent of the road, who signed it, and we hold that he is bound by it.

In the case of the York Company vs. The Illinois Central Railroad Company, 3d Wallace's Reports, 107, the Supreme Court of the United States have *unanimously* held that: "The common law liability of a common-carrier for the safe carriage of goods may be limited and qualified by special *contract* with the owner; provided such special contract do not attempt to cover losses by negligence or misconduct." Thus, when a contract for the transportation of cotton from Memphis to Boston was in the form of a bill of lading, containing a clause exempting the carrier from liability for losses by *fire*, and the cotton was destroyed by fire, the exemption was held sufficient to protect the carrier, the fire not having been occasioned by any want of due care on his part.

In this case the receipt was in the usual form, with a limitation of liability in the following words, "fire and the unavoidable dangers of the river *only excepted.*" The shipper was examined by interrogatories, and annexed a copy of the receipt to his answers, in which he swore that the cotton was shipped on the steamer belonging to the Company before the bills were signed ; that he *had not examined the bills ;* that his attention was not *called to the fire clause,*and that his firm had no authority to ship for their principals with that exemption. Mr. Justice Field, delivering the opinion of the Court, says : "Nor do we perceive any good reason, on principle, why parties should not be permitted to contract for a limited responsibility. The transaction concerns them only, it involves simply rights of property, and the public can have no interest in requiring the responsibility of insurance to accompany the service of transportation in face of a special agree-

Wallace, sup't, *vs.* Matthews.

ment for its relinquishment. By the special agreement the carrier becomes, with reference to the particular transaction, an ordinary bailee and private carrier for hire."

Again he says : " But when such stipulation is made out, and it does not cover losses from negligence or misconduct, we can perceive no just reason for refusing its recognition and enforcement."

To avoid misapprehension it is proper to state, that this decision recognizes the doctrine that a common-carrier is bound to receive goods tendered to him in his line of business, for shipment, and he is liable to a suit for damages for refusing to take them. He cannot screen himself from liability by any general or special notice, nor can he coerce the owner to yield assent to a limitation of responsibility by making exhorbitant charges when such assent is refused. But he may, with the assent of the owner, make a special contract in the face of the receipt, which will limit his liability. This is the doctrine maintained by the unanimous judgment of the Supreme Court of the United States, in the last case decided by it, which involved this question.

We put our judgment, however, upon the facts of this case, which are clearly distinguishable from the cases decided by this Court, which were claimed as authority by counsel for the defendant in error.

Judgment reversed.