SOUTHERN RAILWAY COMPANY *v.* HORNER.

LITTLE, J.　1. Where a petition against a railway company contained two counts, one setting out a cause of action arising ex delicto (being for a breach of its public duty as a carrier), and the other alleging a liability under the statutory obligation imposed by section 2298 of the Civil Code (which provides that the last connecting carrier who receives goods as in good order shall be liable), a demurrer to the petition, undertaking to point out as defects therein that it set forth in one count an action ex contractu, and in another the statutory liability above referred to, was not well taken, inasmuch as such a petition does not undertake to join two such causes as those referred to in the demurrer. It in fact joins a cause of action ex delicto with a statutory right of action, and not a cause of action ex contractu with the statutory right. Properly construed the first count in the petition filed in this case set forth a cause of action ex delicto.

2. Presumptively the court properly submitted to the jury the question whether under the evidence there was an actual agreement as to the value of the horse, or whether the bill of lading introduced in evidence was merely an arbitrary preadjustment of damages, in case the property shipped was lost or damaged, for the purpose of limiting the liability of the carrier against the consequences of its own negligence.

(a) Such an issue properly arose in the present case, because of the wording of the bill of lading.　*Central Ry. Co.* v. *Murphey,* 113 *Ga.* 514.

(b) There was sufficient evidence to support the finding that there was no actual agreement as to value.

3. While a verdict for damages in an action ex delicto can not lawfully embrace interest as such, no such point was properly made on the verdict returned in the present case ; for it was attacked only by a general assignment that it was contrary to law and evidence, which does not present the specific objection that it unlawfully embraced interest as well as principal.

*Judgment affirmed. All the Justices concurring, except Lewis, J., absent.*

Argued February 14, — Decided April 29, 1902.

Action for damages.　Before Judge Calhoun.　City court of Atlanta.　June 27, 1901.

Joshua Horner shipped a horse, of the value of upwards of $500, from Baltimore to Atlanta, consigned to T. M. Horner, the owner of the animal, which, according to the evidence, was put into a closed car and there allowed to remain, without any food, water, ventilation, or any attention whatever, until arrival at destination, a period of three days.　Upon delivery to the consignee the horse was given prompt and proper medical treatment, but died within a week from disease contracted as a result of the neglect on the railroad.　Suit was brought, and a verdict rendered in favor of the plaintiff for $500 principal and $64.45 interest.　The defendant moved for new trial on

the general grounds, and excepted to the overruling of this motion and to the overruling of a demurrer to the declaration.   The ground of this demurrer was, that the declaration set up two separate and distinct causes of action, one being that defendant, by contract with plaintiff, undertook a shipment from Baltimore to Atlanta; the other being that defendant was the last of connecting lines between Baltimore and Atlanta, and received the horse as in good order as said last connection.   The declaration alleged in brief, as follows:  On July 17, 1899, Joshua Horner shipped over the defendant's line of railroad from Baltimore, by way of Washington, to plaintiff at Atlanta, one thoroughbred race-horse of the value of $1,000.   Defendant undertook the contract of conveying said horse at the instance of Joshua Horner, and accepted said horse under its duty as common carrier to take and deliver him safely to plaintiff.   Defendant failed to properly carry the horse, negligently failed to take proper care of him and to feed and water him, and delivered him to plaintiff in a famished and dying condition, for want of proper nourishment, air, exercise, and ventilation en route.   As a result of said negligent acts and omissions on the part of defendant to perform its duty as common carrier, the horse when he reached Atlanta was starved, exhausted, in a state of collapse, and had pneumonia; and as a result he died, to plaintiff's damage in the sum before named. Defendant's conduct aforesaid was not only negligent, but was in violation of the statute of the United States governing the interstate transportation of stock, which requires the same to be fed, watered, and rested every twenty-eight hours, for a period of five hours.   And for further cause of action plaintiff says that defendant was the last of a connecting line of railroads over which the horse was shipped, and that defendant received the horse as in good order.

The testimony was in direct conflict as to the making of a special contract of shipment.   It appears that Joshua Horner directed J. T. Hall to get the freight rate over the different lines to Atlanta; that Hall called on Lee, the soliciting freight agent of the defendant in Baltimore; and that Lee gave him a rate based on a valuation of $100 for the horse, and explained to him that the tariff required an addition of fifty per cent. for each additional $100 of valuation.   Lee testified further, that Hall told him, several days later, that Mr. Horner sent him for free transportation for an attendant to the horse, to which Lee answered that the company did not give

free transportation in such a case, but only for an attendant when a car of horses was shipped, as the freight would justify it in the latter instance but not in the former. Afterwards Lee called upon Horner to see if he intended to ship the horse by defendant's route. Horner said he did so intend, but did not know what to do about a caretaker for the horse; and asked how the horse was to be fed if he did not furnish an attendant. Lee replied, that the law of the land required all railroads carrying live stock to feed and water them at stated intervals; that "our people" would attend to the feeding; and that his experience was that horses in transit were better attended to by the railroads than by trusting to a servant picked up for the occasion. At Horner's request Lee explained to Hall what he had just said to Horner, and in the presence of both of them said that the horse would be fed and watered in transit, and it would be so noted on the way-bill by each of the conductors when it was done while in his charge; that the way-bill was passed on to each conductor in turn; and that he thought, with this precaution, there would be no trouble in shipping the horse through, for want of feed or water. Horner sent the horse to the railroad station by Hall and Hopkins. Hopkins built a stall in the car and placed the horse in it. He put into the car twelve packages of oats, each containing two quarts, a bale of hay, a barrel of water, and a bucket. He knew nothing of the contract of shipment. He testified that the agent of the railroad company said that it would not be necessary for any one to go with the horse, as the company would take care of it from Baltimore to Atlanta. The defendant introduced a "uniform live-stock contract," dated July 17, 1899, and signed for the initial carrier by the clerk of the station agent, and for "Joshua Horner, shipper, by J. T. Hall, shipper's agent." It recites "that the said shipper has delivered to the said carrier . . 1 horse (shipper refused to furnish an attendant), for transportation from ———— to destination, if on said carrier's line of railroad, otherwise to the place where said live stock is to be received by the connecting carriers for transportation to or toward destination; and that the same has been received by said carrier for itself and on behalf of connecting carriers, for transportation, subject to the official tariffs, classifications, and rules of the said company, and upon the following terms and conditions, which are admitted and accepted by the said shipper as just and reasonable,

viz.: The said shipper or the consignee is to pay freight thereon to the said carrier at the rate of —— per ——, which is the lower published tariff rate, based upon the express condition that the carrier assumes liability on the said live stock to the extent only of the following agreed valuation, upon which valuation is based the rate charged for the transportation of the said animals, and beyond which valuation neither the said carrier nor any connecting carrier shall be liable in any event, whether the loss or damage occur through the negligence of the said carrier or connecting carriers or their employees, or otherwise: If horses or mules, not exceeding 100 $100.00 each. . . That the said shipper is, at his own sole risk and expense, to load and take care of and to feed and water said stock whilst being transported, . . and neither said carrier nor any connecting carrier is to be under any liability or duty with reference thereto, except in the actual transportation of the same. That the said shipper is to inspect the body of the car or cars in which said stock is to be transported, and satisfy himself that they are sufficient and safe and in proper order and condition ; and said carrier or any connecting carrier shall not be liable on account of any loss of or injury to said stock happening by reason of any alleged insufficiency in, or defective condition of, the body of said car or cars." The instrument then sets forth numerous further limitations of the carrier's liability, not pertinent to this case, and closes thus: " And —— do hereby acknowledge that —— had the option of shipping the above-described live stock at a higher rate of freight according to the official tariffs, classifications, and rules of the said carrier and connecting carriers, and thereby receiving the security of the liability of the said carrier and connecting railroad and transportation companies as common carriers of the said live stock upon their respective roads and lines, but have voluntarily decided to ship same under this contract at the reduced rate of freight above first mentioned." Joined to this instrument was a coupon of the same date and signed likewise, viz.: "Joshua Horner delivered to the P., W. & B. R. R. Company (subject to all the conditions of the uniform live-stock contract executed as of even date herewith and now in the possession of the said company, of which this coupon is a part) live stock of the kind and number, and consigned and destined as follows: One (1) horse, shipper refused to furnish an attendant. . . "

Cass, the clerk of the station agent, testified: The contract was in two parts, one of which was delivered to the shipper and the other retained by the company. It was a receipt for the live stock shipped, giving the name of the consignor and the consignee, the description of the stock shipped, and its destination. The signature for the company was made by me under authority from the station agent. Joshua Horner's name was signed to the contract by J. T. Hall as his agent. The car was seen and inspected by Hall, who had the right to accept or reject it as he saw fit, and who had ample opportunity to determine its fitness or unfitness for the transportation of live stock. He suggested that the doors of the car be left open and bars be placed across the opening; this was referred to the chief clerk, who explained that it would be dangerous in case the horse should get loose in the car; and Hall agreed to the closing of the doors, they being left open on each side about six inches. I had no dealings with any one but Hall; do not know Horner. — Keith, a claim clerk of the defendant, testified that he received the coupon, or detached part of the bill of lading, from the plaintiff. The plaintiff testified that he never saw this paper; and his testimony and that of Joshua Horner all goes to show that neither of them ever saw it or the main part of the bill of lading, or had any knowledge of the making of a special contract limiting value or limiting the liability of the carrier, or authorized any one to sign it. No testimony by Hall appears.

*Dorsey, Brewster & Howell, Sanders McDaniel*, and *Arthur Heyman*, for plaintiff in error. *Arnold & Arnold*, contra.