CENTRAL OF GEORGIA RAILWAY CO. *v.* HALL *et al.*

1. A common carrier can not limit his legal liability by any notice given, either by publication or by entry on receipts given or tickets sold. By special contract he may relieve himself of his common-law liability as an insurer, and may contract against liability arising from certain losses which do not involve negligence of the carrier or his servants; but he can not, even by special contract, exempt himself from liability for loss of goods intrusted to him, where the loss arises from his negligence or that of his servants.

2. A common carrier of goods which transports live stock is as to the latter property also a common carrier. There are, however, certain inherent differences between live stock and inanimate property offered for transportation.

3. A carrier of live stock may by special contract so limit its liability for loss or damage that it will be liable only in the event that it is guilty of gross negligence.

4. A railway company in its capacity as a common carrier may, as a basis for fixing its charges and limiting the amount of its corresponding liability, lawfully make with a shipper a contract of affreightment embracing an actual and bona fide agreement as to the value of the property to be transported; and in such case the latter, when loss, damage, or destruction occurs, will be bound by the agreed valuation. But a mere general limitation as to value, expressed in a bill of lading, and amounting to no more than an arbitrary preadjustment of the measure of damages, will not, though the shipper assent in writing to the terms of the document, serve to exempt a negligent carrier from liability for the true value.

5. Where there is an issue of fact as to whether there was an actual bona fide valuation or a mere arbitrary effort to limit liability, the question is one for the jury; but where the written contract shows that it falls within the latter description, and there is no issue of fact on that subject, it is proper for the court to construe the contract.

6. The evidence in this case was not sufficient to show the perpetration of any fraud by the shipper on the company.

7. Where the common-law rule applies, under which no excuse avails a common carrier in cases of loss unless it was occasioned by the act of God or the public enemies of the State, if a locomotive engineer desired to leave his train and proceed with the engine some distance to a water-tank for the purpose of obtaining water, and thereupon caused the flagman to uncouple the engine from the cars, which were left standing on the track while the engineer, in company with the conductor (who had authority to control him) and the fireman, proceeded on the engine to the water-tank, obtained the water, and returned to where the cars were, but the engineer caused the engine to run at such a rate of speed as to be evidently dangerous and to result in wrecking one of the cars and causing the loss of property being transported, even if he were insane at the time, the loss could not be attributed to the act of God within the meaning of the rule of law referred to, so as to excuse the carrier.

8. The meaning of "the act of God" falling within the rule discussed.

9. In this State it is the general rule, that, in order to avail himself of the act of God as an excuse, the burden is upon the common carrier to establish not only that the act of God ultimately occasioned the loss, but that his own negligence did not contribute thereto.

10. Where, under a special contract for the shipment of live stock, the common-law liability of the common carrier was so modified that the carrier was liable for injuries arising only from fraud or gross negligence, it was admissible to defend by pleading and proving that its engineer upon the train on which the goods were shipped suddenly became insane at the time of the transaction complained of; and it would be for the jury to say whether the carrier did not know, or could not by the exercise of proper care have known of it, and whether it exercised due diligence in view of the situation and circumstances disclosed by the evidence.

11. Where an action was brought against a railroad company for loss alleged to have arisen from negligence, and the defendant in its answer denied the negligence, and some two years thereafter, pending the trial of the case, amended its pleadings by setting up that the engineer in charge of its engine became suddenly insane at the time of the transaction complained of, and that it was thereby relieved from liability, counsel for the plaintiff could legitimately comment upon the time when this amendment was made and this defense set up.

12. Where a suit is brought for damages arising from the destruction of property, and there is a basis of calculation as to the value, interest is not recoverable eo nomine. But the jury may consider the length of time damages have been withheld, the character of the tort, the conduct of the defendant, and all the circumstances of the transaction, and may in their discretion increase the amount of damages by adding to the value of the property destroyed a sum equal to the interest on such value, the entire sum found being returned as damages, and not exceeding the amount sued for.

Argued July 11,—Decided November 20, 1905.

Action for damages. Before Judge Lewis. Morgan superior court. December 7, 1904.

Hall and Crawford brought suit against the Central of Georgia Railway Company to recover damages for the killing of a mare. There was no conflict in the evidence as to the following facts: One White, acting for the plaintiffs, who were the owners of the mare, shipped her from Augusta to Bishop, Georgia, along with several other horses over the defendant's railroad. The train came to a standstill and was divided into two sections, with one of which the engineer proceeded. At a point on the road the engineer said that the engine was out of water, and that he must go on to the water-tank. The engine was cut loose from the cars and went on

to the tank, where water was obtained. The conductor and the fireman accompanied the engineer. On the return the speed at which the engineer ran the engine was twenty or twenty-five miles an hour. The conductor warned him three or four times that he should reduce the speed or the engine would run into the cars. He replied that he knew where the train was. There was a collision. The car containing the mare was wrecked and she was killed. The defendant denied negligence and pleaded that the engineer was stricken with sudden insanity at the time and while the transaction was in progress, that his acts were due thereto, and that there was no negligence on the part of the defendant. The plaintiff demurred to the plea, but the demurrer was overruled. Evidence was introduced as to the market value of the horse. The jury found for the plaintiff $800. The defendant moved for a new trial which was denied, and it excepted. Plaintiff filed a cross-bill of exceptions complaining of the allowance of the plea setting up a sudden access of insanity, and the refusal to sustain the demurrer thereto. The other facts, so far as necessary, are stated in the opinion.

*N. E. & W. A. Harris,* for plaintiff in error.

*Samuel H. Sibley,* contra.

LUMPKIN, J. 1-3. In cases of loss the presumption of law is against a common carrier, and no excuse avails him unless it was occasioned by the act of God or the public enemies of the State. "A common carrier can not limit his legal liability by any notice given, either by publication or by entry on receipts given or tickets sold. He may make an express contract, and will then be governed thereby." Civil Code, §§2264, 2276. Construing these two sections together, the latter does not intend to permit a common carrier to relieve himself of the duty of exercising diligence; but by special contract to relieve himself of his common-law liability as an insurer, and to contract against liability arising from certain losses which do not involve negligence of the carrier or his servants. The requirement of diligence on the part of a common carrier is one involving public policy, and it would be contrary to such policy to allow him to relieve himself from his duty in this regard by contract. A common carrier can not, therefore, by special contract exempt himself from liability for loss of goods intrusted to him, where the loss arises from his own negligence. *Berry* v. *Cooper,*

28 *Ga.* 543; *Purcell* v. *Southern Express Co.,* 34 *Ga.* 315; *Southern Express Co.* v. *Purcell,* 37 *Ga.* 103(2); *Western & Atlantic R. Co.* v. *Exposition Cotton Mills,* 81 *Ga.* 522; *Georgia R. Co.* v. *Gann & Reaves,* 68 *Ga.* 350; *Central R. Co.* v. *Pickett & Blair,* 87 *Ga.* 734. In *Savannah, Florida & Western Ry. Co.* v. *Sloat,* 93 *Ga.* 803, it was said that the question as to how far a shipper might, by express agreement signed by him, contract against liability on the part of a common carrier for injuries arising from negligence, was still an open question. But in the next case reported in the same volume it was said, "But carriers can not by any special contract exempt themselves from liability for loss occasioned by their negligence." *Georgia R. Co.* v. *Keener,* 93 *Ga.* 808. The carrier referred to was a common carrier. See also *Wood* v. *Southern Express Co.,* 95 *Ga.* 451-2; *Central Ry. Co.* v. *Murphey,* 113 *Ga.* 514. This ruling is not dependent upon our statute, but accords with the decisions of other courts, though it is not universally so held. 6 Cyc. 387, 388.

A common carrier of goods, which transports live stock, is as to the latter property also a common carrier. Hutchinson on Carriers (2d ed.), §221; 5 Am. & Eng. Enc. Law (2d ed.), 428. It has nevertheless been held that a carrier of live stock may by special contract so limit its liability for loss or damage that it will be liable only in the event that it is guilty of gross negligence. *Cooper* v. *Raleigh & Gaston R. Co.,* 110 *Ga.* 659; *Georgia Railroad* v. *Spears,* 66 *Ga.* 485; *Central R.* v. *Bryant,* 73 *Ga.* 722; *Cincinnati Ry.* v. *Disbrow,* 76 *Ga.* 253. If it were an original question, it might well be argued that it is somewhat anomalous to hold that such a carrier is a common carrier of live stock, that extraordinary diligence is required of it (now so declared in the statutes of this State), and that it is contrary to public policy to allow a common carrier to contract against liability resulting from its own negligence, and yet to say that in regard to live stock it may contract against such liability except as to gross negligence. See 6 Cyc. 391, 392, and cit.; N. Y. Central R. Co. *v.* Lockwood, 17 Wall. 357; E. T. V. & G. R. Co. *v.* Johnston, 75 Ala. 596-605, 51 Am. R. 489. But the ruling seems to be established in this State. Perhaps the difference between live stock and inanimate freight may furnish the basis for this holding.

In the case at bar the contract provided that the owner or shipper

assumed and released the railroad from "all other damage incident to railroad transportation, which shall not have been caused by fraud or gross negligence of said company." This became the measure of the negligence which would render it liable. The presiding judge, in effect, so charged; and we do not think his charge, taken as a whole, was subject to the criticisms made upon it as to this point.

4. It was contended that under the contract the defendant was not liable for the value of the horse beyond the sum of $125. Was the contract relied on by the defendant an actual bona fide agreement as to the value of the property lost, or was it a mere general limitation as to value, amounting to an arbitrary preadjustment of damages? The former would be valid; the latter not. *Central Ry. Co.* v. *Murphey,* 113 *Ga.* 514; *Georgia R. Co.* v. *Keener,* 93 *Ga.* 808; *Georgia Southern Ry. Co.* v. *Johnson,* 121 *Ga.* 231. The contract, which was included in the bill of affreightment and signed by the agent of the owner and the agent of the company, contained the following provision: "And it is further agreed that should any damage occur for which the company may be liable, the value at the place and date of shipment shall govern the settlement, in which the amount claimed shall not exceed, for a stallion or jack, $200.00; for a horse or mule, $125.00; cattle, $40.00; other animals, $20.00." This was upon a printed blank containing these amounts already prepared. It did not purport to put a valuation upon the particular horse or horses shipped, but limited the amount to be claimed for any horse, regardless of its real or estimated value, to $125. It had a prearranged amount to which its liability should be limited as to various animals. If this could be treated as a bona fide estimate or valuation as to the horse which was killed, it might equally be said to be a valuation of every possible horse which might be shipped, before it was ever seen or heard of by the company's agent. The expression "other animals $20.00" would thus be treated as being a bona fide valuation of any other animal, regardless of what was its nature, character, or actual value. A rabbit, a hog, or an elephant might equally fall under the designation of "other animals," and the arbitrary limitation of $20 would apply equally to each of them. Moreover it will be noticed that, in case of loss, the company does not agree that the value of the horse shall be fixed at $125; but the agreement is that "the amount claimed shall not exceed"

that sum. This was clearly an attempt to limit the liability, not to determine value. As was said in the opinion in *Central Ry. Co.* v. *Murphey,* "Could any fair and reasonable mind ever reach the conclusion that there was between the plaintiffs and the defendant any agreement at all respecting the value of this particular car-load of grapes, or that there was even a remote intention to make such an agreement?"

5. Should the presiding judge have submitted the question to the jury to decide as to whether this contract amounted to an actual bona fide valuation? On its face it did not do so. Outside of the paper there was no evidence of any actual valuation of this particular horse. It, with several others, was delivered to the railroad company together with certain sulkies, which seems to have indicated that the horses were to be used otherwise than as common draft animals. Eight horses were also shipped in two cars, and an attendant went with them. No inquiry was made as to their nature or value. The company had two kinds of blanks, one for use where live-stock was shipped "released," the other where it was not. An agent of the defendant asked the plaintiff's agent if he wished to ship the horses "released," and, upon receiving an affirmative answer, filled one of the blanks, except as to the rate, which was filled in by the rate clerk. There is only one "release rate" for horses. The rate clerk has the classification of the State railroad commission, and fills in the rate that belongs to that agreement. A witness for the defendant testified that the rate was fixed at $27 per car between the points included in the transportation, "based on the valuation of $125.00;" but he admitted that nothing was said to the shipper as to valuation. This was the entire transaction. True the shipper admitted that he knew that if he had named a higher valuation on the horses he would have had to pay a higher rate, and that if he had not shipped "released" the rate would have been much higher. But there was nothing in what transpired between the parties to show a bona fide effort to fix a value on the horse which was killed, or on any one or all of the horses. Every shipper who is asked whether he will ship "released" probably knows that if he does not do so the rate will be higher. But this does not change an effort to limit liability into an actual valuation of property.

The construction of the contract made in this case is controlled

by the decisions in *Georgia R. Co.* v. *Keener,* supra; *Central Ry. Co.* v. *Murphey,* supra.    The decision in *Southern Railway Co.* v. *Horner,* 115 *Ga.* 381, is cited to sustain the contention that the case should have been submitted to the jury.    In that case it is stated, in the report of facts, that "The testimony was in direct conflict as to the making of a special contract of shipment    .    .    ; and that Lee [the defendant's agent] gave him a rate based on a valuation of $100 for the horse, and explained to him that the tariff required an addition of fifty per cent. for each additional $100 of valuation." The contract contained the following terms: "The said shipper or the consignee is to pay freight thereon to the said carrier at the rate of — per —, which is the lower published tariff rate, based upon the express condition that the carrier assumes liability on the said live stock to the extent only of the following agreed valuation, upon which valuation is based the rate charged for the transportation of the said animals, and beyond which valuation neither the said carrier nor any connecting carrier shall be liable in any event. . . If horses or mules, not exceeding 100, $100.00 each," etc.    It was held, that, under the terms of this contract and the evidence introduced, an issue was made as to whether in fact there was a valuation or an arbitrary preadjustment of damages, and that this was properly submitted to the jury.    The difference between submitting to the jury to determine, under the evidence, whether terms of this character inserted in a contract of affreightment constituted a bona fide and actual valuation or a mere preadjustment of damages, and on the other hand submitting to the jury the construction of the contract alone, which plainly on its face was not a valuation but an effort to limit damages, is clear.    The case of *Central Ry. Co.* v. *Glascock,* 117 *Ga.* 938, is also cited as authority to show that the present case should have been submitted to the jury.    On a casual inspection it might appear to be so, but an examination of the record in that case shows that the contract contained language somewhat similar to that considered in the case of *Southern Ry Co.* v. *Horner,* supra.    After stating that, if the carrier should be liable, the value at the place and date of shipment should govern the settlement, in which the amount claimed should not exceed certain specified sums, it was added, "which amounts it is agreed are as much as such animals as are herein agreed to be transported are reasonably worth;" and stamped across the face of the contract was

the statement, "The attention of shippers has been called to the terms, conditions, values, etc., herein named." (These facts do not appear as fully in the printed report as in the record of file in this court.) This made a question for submission to the jury. In the case at bar there was nothing to show that there had been an actual valuation.

6. It was contended that the evidence in this case was sufficient to show fraud on the part of the shipper, and that the question of its existence should have been submitted to the jury. We can not concur in this view. There is nothing to show that there was any misrepresentation, concealment, or artifice which would deceive the agent of the carrier as to the nature or character of the property. It appears to have been openly shipped, and, as already mentioned, in such a way as to indicate that the horses were not mere common animals shipped in car-load lots. They were open to the inspection of the agent. He took no precaution and asked no questions as to their value. He asked alone as to whether they should be shipped "released." He relied on the making of the contract, which, as to this point, was not binding under the law. The Civil Code, § 2290, reads as follows: "The carrier may require the nature and value of the goods delivered to him to be made known, and any fraudulent acts, sayings, or concealment by his customers will release him from liability."

In *Southern Express Co.* v. *Everett,* 37 *Ga.* 688, it was held that if a shipper at the time of the delivery of the goods for shipment practices any fraudulent acts, sayings, or concealments upon the carrier as to the value of the parcel, or resorts to any artifice to give a box containing a valuable diamond breastpin a mean appearance, and thereby to induce the carrier to think it of trifling value, and so prevent him from making inquiries, this would operate as a fraud, and relieve him from liability. In *Green* v. *Southern Express Co.,* 45 *Ga.* 305, the evidence for the defendant was to the effect that the plaintiff valued the property involved in the controversy at $100. He testified that he shipped a trunk, and was asked its value but failed to give it. In *Savannah, Florida & Western Ry. Co.* v. *Collins,* 77 *Ga.* 376, the property was shipped as a bundle of bedding, nothing being said about wearing apparel, and after loss the shipper sought to recover the value of certain wearing apparel claimed to have been wrapped up in the bedding. In *Southern Ex.*

*Co.* v. *Wood,* 98 *Ga.* 268, the conduct of the shipper was calculated to mislead the agent of the railroad and conceal the true character of the contents of the package delivered for transportation. In *Georgia Southern Ry. Co.* v. *Johnson,* 121 *Ga.* 231, the shippers sent candy to a railroad for transportation. It was in boxes, and the contents of the packages were unknown to the company. Candy could be shipped in either of two classes, having different freight rates. The shippers classified the candy as of the lower grade, and thus prepared shipping tickets, using a form containing the words, "Candy released, six cts. per pound valuation," and obtained a lower rate of freight. On this the railroad received the goods. · It was held, that, upon damage or loss occurring, the shippers could not recover at a higher valuation than that so fixed. In the case under consideration there was nothing to mislead the carrier or prevent its agents from making inquiries as to value.

7, 8. The defendant pleaded, that its engineer in charge of its train became suddenly insane, and lost his power of mental control and discretion; that this was unknown to the defendant or any of its agents or employees until after said transaction, and could not have been known to it by the exercise of all the diligence required of it by law; and that all the acts of the engineer complained of were due to the sudden insanity which developed at the time and while the transaction was going on, unmixed with any negligence of the defendant. The plaintiff demurred to this plea, and the demurrer was overruled. The court charged, in effect, that if the engineer suddenly became insane, and thereby became demented to such an extent as to lose his reason and render him totally irresponsible for his acts, such insanity and acts growing out of it would, in a legal sense, be the act of God. To this charge the defendant excepted. The determination of the defendant's liability in the present case does not rest upon the common-law liability of common carriers as insurers, but upon a special contract. But as the judge charged as above stated, and the question has been argued before us, the writer deems it not improper to discuss the case as it would stand at common law in the absence of a limiting contract.

Much learning and ability has been expended on the subject of what constitutes an "act of God" which will relieve a common carrier. Lord Coke made frequent use of the expression, applying it to death, sudden tempests, and the like. In Forward *v.* Pittard,

1 Term R. 27-33, Lord Mansfield used the following oft-quoted language: "Now what is the act of God? I consider it to mean something in opposition to the act of man: for everything is the act of God that happens by his permission; every thing by his knowledge. But to prevent litigation, collusion, and the necessity of going into circumstances impossible to be unravelled, the law presumes against the carrier, unless he shows it was done by the King's enemies, or by such act as could not happen by the intervention of man, as storms, lightning, and tempests." Some courts have held that the terms "act of God," and "inevitable accident," are synonymous. But others have held that there was a distinction. For interesting discussions and illustration of acts which fall within the designation, "acts of God," see Pandorf v. Hamilton, L. R. 17 Q. B. 670; Nugent v. Smith, L. R. 1 Com. Pl. Div. 423 et seq.; Hays v. Kennedy, 41 Penn. St. 378. In an elaborate and able note to Coggs v. Bernard, 1 Smith's L. C. (8th ed.) 422 et seq., the cases are reviewed, and it is said: "Upon the whole, it would seem that an act of God signifies the extraordinary violence of nature . . and these cases now express the more commonly recognized law,—that the act of God which excuses the carrier must be a direct and violent act of nature." In these authorities are also discussed the terms, "unavoidable accident," "inevitable accident," "perils of the sea," and similar expressions frequently used in bills of affreightment. See also Stroud's Jud. Dic.; Bouvier's Law Dic.; Black's Law Dic.; Anderson's Law Dic. words "Act of God," "Common carrier," and cit.; 3 Wood's Ry. Law, 1574; 2 Kent's Com. 598; 5 Thomp. Neg. 6456; Story, Bailments (9th ed.) §25.

In *Fish* v. *Chapman, 2 Ga.* 349, the liability of common carriers and their right of defense on the ground that the injury was occasioned by the "act of God" was considered. Nisbet, J., in the opinion used the following language: "Unavoidable accidents are, in our opinion, the acts of God. The latter words express the same acts, and no more than the former; the two phrases mean the same thing. See Story on Bailm. secs. 25, 511; 2 Kent, 597. What, then, are acts of God or unavoidable accidents? For it is from these only that this party is protected. By the act of God is meant any accident produced by physical causes which are irresistible; such as lightning, storms, perils of the sea, earthquakes, inundations, sudden death or illness. Story on Bailm. sec. 25; 2 Kent,

597. The act of God excludes all idea of human agency. Mc-Arthur & Hurlbut *vs.* Sears, 21 Wend. R. 190. In this case it is said: 'No matter what degree of prudence may be exercised by the carrier or his servants, although the delusion by which it is baffled or the force by which it is overcome be inevitable, yet if it be the result of human means the carrier is responsible.' See also 1 Murphy, 173; 2 Bailey, 157; Idem, 421." In *Central Line* v. *Lowe, 50 Ga.* 509, Judge McCay, delivering the opinion, said: "There is, doubtless, a distinction between an 'act of God' and an 'unavoidable accident.' The former covers only natural accidents, such as lightning, earthquakes, tempests, and the like, and not accidents arising from the negligence or act of man." In *Doster* v. *Brown, 25 Ga.* 24-26, Judge McDonald, delivering the opinion, said: "While every shower of rain that falls upon the earth is the act of God, in contradistinction to the act of man, yet an ordinary freshet is not the act of God, in the legal sense which protects a man against responsibility for the non-performance of a contract like that made by this plaintiff." See also *Cannon* v. *Hunt,* 113 *Ga.* 501-509; *Young* v. *Waldrip,* 91 *Ga.* 765; *Richmond R. Co.* v. *White,* 88 *Ga.* 805; *Carr* v. *Houston Warehouse Co.,* 105 *Ga.* 268. In the case of McArthur *v.* Sears, 21 Wend. 190, which is cited as authority in the case of *Fish* v. *Chapman,* supra, a steamboat had been driven on shore by a previous gale; as a second steamboat later approached the harbor at night, the weather was hazy and snow was falling. Those in charge were misled by the light of the boat on shore, and the second boat struck a shoal. It was held not to excuse the carrier.

In Merritt *v.* Earle, 29 N. Y. 115, it is said: "By the 'act of God' is meant something which operates without any aid or interference from man. When the loss is occasioned, or is the result in any degree of human aid or interference, the case does not fall within the exceptions of the carrier's liability." See also New Brunswick Steamboat etc. Co. *v.* Tiers, 4 Zab. 697, 64 Am. Dec. 394. The maxim that "The act of God is so treated by the law as to affect no one injuriously" (Actus Dei nemini facit injuriam) has a general application, and is not limited to cases affecting common carriers. Broom's Legal Maxims (8th ed.), 229, *230. Nevertheless, in 16 Am. & Eng. Enc. Law (2d ed.), 622, it is said: "A lunatic is not responsible for crime, because he is not a free agent, capa-

ble of intelligent voluntary action, and therefore is incapable of a guilty intent; but in a civil action for an injury done to the person or property of another, the intent is generally immaterial, and the rule is that an insane person is liable for his torts the same as a sane person, except for those torts in which malice, and therefore intention, is a necessary ingredient. . . In respect to this liability there is no distinction between torts of nonfeasance and of misfeasance; and consequently an insane person is liable for injuries caused by his tortious negligence. Insane persons are held to this liability on the principle that where a loss must be borne by one of two innocent persons, it shall be borne by him who occasioned it. This position is sustained by a number of authorities. Cooley on Torts (2d ed.), 115, m. p. 99 et seq.; Cross v. Kent, 32 Md. 581; White v. Farley, 81 Ala. 563; Behrens v. McKenzie, 23 Iowa, 333; Avery v. Wilson, 20 Fed. 856; Krom v. Schoonmaker, 3 Barb. 647; Jewell v. Colby, 66 N. H. 399 (holding that the damages recoverable are limited to compensation for actual loss sustained by the injured party); Morse v. Crawford, 17 Vt. 499; Williams v. Hays, 143 N. Y. 442, 42 Am. S. R. 743, 157 N. Y. 541.

When the case of Williams v. Hays was first before the Court of Appeals of New York it was decided that "If one of several owners of a ship is in charge thereof under a contract with the others as lessee or bailee, and on his attention being called to its peril refuses to believe in such peril, though apparent, or to take any measures to avert it, and thereby the ship is lost, he is answerable to his co-owners for his negligence, though it was induced by his insanity at the time." Earle, J., delivered a learned opinion, citing many authorities on the subject. In the course of it he made use of this expression: "If the defendant had become insane solely in consequence of his efforts to save the vessel during the storm, we would have had a different case to deal with." When the case was before the Court of Appeals for the second time, it was held that this question should be submitted to the jury, Bartlett, J., dissenting.

Indeed, a little reflection will suffice to show that the injury in this case could not fairly be considered as arising from the act of God. For this defense to be available as an excuse to a common carrier the act of God must be the proximate cause of the loss or injury. Hutchinson on Carriers (2d ed.), §§ 179, 180, 180(a). If insanity were to be analogized to sudden or overpowering illness

which renders it impossible for a person to perform an act or discharge a duty, nevertheless in this case the act of God was not the immediate or proximate cause of the loss, unaffected by human agency. If insanity be treated as an act of God, it was not insanity alone which killed the horse. The engineer, conductor, and flagman were all concerned in separating the engine from the cars and leaving them apparently without light or warning signal upon the track; the engineer, the fireman, and the conductor all went together to the water-tank. The engineer set the engine in motion at a rapid speed while returning to the cars. It is not pretended that he was stricken with illness or even insanity after he did this, so as to prevent his stopping the engine. But the contention is that because of unsoundness of mind he did careless or reckless acts. Suppose that, instead of having killed the horse by the collision, the engineer had stolen the horse, would it be contended that, by showing insanity on his part, the taking became the act of God? Or, if the agent of the company had made a mistake and delivered the plaintiff's horse to some other person, whereby it was lost to the plaintiff, would it be urged that, if the agent were insane, the delivery of the horse to the wrong person was an act of God? Surely not. Sudden death, or sickness of such a character as to render action impossible, may sometimes excuse non-action. But tortious action does not become the act of God because the person acting may be sick.

9. There is a further reason why, under the evidence in this case, this defense could not avail the defendant. In *Richmond R. Co.* v. *White,* 88 *Ga.* 805, it was said: "And generally, in order for the carrier to avail himself of the act of God as an excuse, the burden of proof is upon him to establish, not only that the act of God ultimately occasioned the loss, but that his own negligence did not contribute thereto, for 'in cases of loss the presumption of law is against him.'" *Central Railroad Co.* v. *Hasselkus,* 91 *Ga.* 382(3); Civil Code, §2265. Here the presiding judge charged that gross negligence took the place of negligence, in stating the rule.

10. The present case, however, does not rest on the common-law liability of common carriers. A special contract in regard to the shipment of the live stock was made which exempted the carrier from all liability incidental to railroad transportation, except for fraud or gross negligence on its part. Under such facts, does the

rule that a tortfeasor is not generally excused from liability for actual damages by reason of insanity apply also to an insane agent, so that the principal is liable for an injury committed by such an agent, if the latter becomes suddenly and totally insane, and the principal and his other agents are without fault? The reasoning that if the loss must be borne by one of two innocent parties, it should be borne by him who occasioned it, is not to be carried to the extreme of holding that the mere fact of the occurrence of loss necessitates a recovery in all cases, regardless of whether there was negligence or any violation of legal duty. On the general subject see Brown *v.* Collins, 53 N. H. 443, 16 Am. R. 372. This is not a case of a physical injury to the person, and does not fall within the principle of law codified in the Civil Code, § 3826, which declares as follows: "A physical injury done to another gives a right of action, whatever may be the intention of the actor, unless he is justified under some rule of law. The intention should be considered in the assessment of damages." But even this was held not to create liability for a personal injury resulting from falling into an elevator shaft, in the absence of negligence of the owner. *Whatley* v. *Block,* 95 *Ga.* 15. Nor is the present action for conversion. It is a suit for damages claimed to have resulted from gross negligence.

Aside from the common-law liability of carriers, or any statutory provision, the general rule is stated in Angell & Ames on Corp. (11th ed.) 310, thus: "As natural persons are liable for the wrongful acts and neglects of their servants and agents, done in the course and within the scope of their employment, so are corporations, upon the same grounds, in the same manner, and to the same extent." See also §§ 382, 383; Morawetz on Priv. Corp. §§ 725, 730. Suppose that the agent of an individual should become suddenly and wholly insane without the knowledge of the principal, would the latter be responsible for all his acts both of omission and commission, in the absence of any wrongful act or failure of duty on his own part or that of his other agents? In such examination as I have been able to make, I have found no case which extends the doctrine of liability of a person for his own torts, regardless of his insanity, to liability of a principal for the negligent torts of an insane agent, unless the principal commanded or assented to the acts, or knew of the insanity, or he or his other

agents failed in some respect in their duty. In Buswell on Insanity, §§355-6, the author recognizes the rule, that, "although a lunatic may not be punishable criminally, he is liable, in a civil action, for any tort he may commit." Yet he says (§357), "It would seem that if one knowingly employs an insane person as his servant or agent, he will be liable for damages to innocent third parties resulting from acts done by the insane person in the scope of his employment." By analogy to this principle, it was held in Cole *v.* Nashville, 4 Sneed (Tenn.), 162, that if a municipal corporation, "knowing a person to be a lunatic, commission him by its license to follow within its limits a dangerous avocation, the exercise whereof requires great caution and circumspection, and while such person is so engaged under said license any injury be done to an individual by the act of such person in the pursuit of said business, the corporation is liable in damages to the injured party." In *Christian* v. *Columbus Ry. Co.,* 79 *Ga.* 460, the declaration alleged that the railroad company knowingly employed an insane agent who committed a homicide while in charge of its office. In the opinion it was said: "We think also that if the homicide was the result of insanity, and the railroad company was faultless in regard to employing the agent, anything that would excuse the agent criminally for the act would excuse the railroad company civilly." As it was alleged that the company employed the agent knowing of his insanity, the point now being considered was not directly involved; nor was this a conclusive holding that the test of criminal and civil liability is the same (see discussion in *Berkner* v. *Dannenberg,* 116 *Ga.* 954); but it is cited to show that this court did not treat the principal as at all events liable for the conduct of an insane agent. Insane persons are generally declared incompetent to be agents. Story on Agency, §7; 1 Am. & Eng. Enc. Law (2d ed.), 945. The Civil Code, §3001, says: "Any person may be appointed an agent who is of sound mind." If a principal selects a sane agent, he takes the risk of the possible negligence or tortious conduct of such agent acting within the scope of his agency; but becoming insane is an abnormal condition, and is not ordinarily one of the risks in contemplation. Of course, if the principal knowingly appoints an insane person as his agent, or permits such a one to act for him after knowledge of the insanity, he will not be excused by reason of it.

We concur with the trial judge in holding that to be an excuse the insanity must be so sudden that the principal was not charged with notice of it, or with want of proper care after its discovery, and total in character, so as to practically make the agent incapable of committing a voluntary act. So long as it is merely a partial derangement, he remains to some extent a sentient agent acting for his principal; and it would involve a maze of uncertainty to undertake to hold the principal partially liable and partially not. Indeed, Professor Wharton contends that an irresponsible man is not to be considered as a juridical cause, but rather like a weapon of wood or stone, incapable of intelligent choice, and acting only as it is employed or compelled. Whart. Neg. (2d ed.) §88. Under the law of this State, on proof of the loss a presumption of negligence arose against the railroad company, and the burden was on it to show not only the insanity of the engineer, but also that it or its other agents were not chargeable with gross negligence contributing to the injury. If they were so, the defense would fail. From a careful examination of the evidence we are of the opinion that it failed to show a sufficient defense. There was no evidence of any sudden insanity coming on the engineer in the midst of this transaction. So far as the evidence tended to show insanity at all at that time, it indicated that certain symptoms (such as irritability, moodiness at times, etc.) had been observed before the occurrence. The engineer was not discharged because he was insane, but because he was at fault. He continued to run an engine for months after this transaction, and a considerable time had elapsed before a physician advised that he was insane and should be sent to the asylum. Moreover the conductor was on the engine with him, had authority to compel him to obey orders, and spoke to him of the danger, but permitted him to proceed, when he said that he knew where the other cars were. The presiding judge submitted the issue to the jury, and they found the defendant liable.

11. Complaint is made that the court permitted counsel for the plaintiff to comment upon the fact that no defense of insanity was set up when the action was originally brought in 1902, but was brought in by way of amendment to the defendant's answer pending the trial of the case in September, 1904. While an amendment, when allowed, generally relates back to the filing of the pleading amended, it is nevertheless legitimate for counsel to comment on the

occurrences during the trial of the case, including the setting up of the defense of insanity which was not originally referred to in the pleadings. *Inman* v. *State,* 72 *Ga.* 269; *McBride* v. *Macon Tel: Pub. Co.,* 102 *Ga.* 422.

12. The headnote sufficiently states our ruling on the subject of adding interest to the value of the property destroyed. *Western & Atlantic R. Co.* v. *McCauley,* 68 *Ga.* 818; *Central R.* v. *Sears,* 66 *Ga.* 499; *Western & Atlantic R. Co.* v. *Brown,* 102 *Ga.* 13. Where the damages found are discretionary or punitive, this rule does not apply. *Western & Atlantic R. Co.* v. *Young,* 81 *Ga.* 397; *Ratteree* v. *Chapman,* 79 *Ga.* 574.

A consideration of all the grounds of the motion for a new trial satisfies, us that there were no errors requiring a reversal.

*Judgment on the main bill of exceptions affirmed. Cross-bill dismissed. All the Justices concur, except Beck, J., not presiding.*