## 5409, 5410. NASHVILLE, CHATTANOOGA & ST. LOUIS RAILWAY *v.* TRUITT COMPANY, and *vice versa.*

1. The provision in the Carmack amendment of June 29, 1906 (34 Stat. 593, Chap. 3591, U. S. Comp. Stat. Supp. 1911, p. 1307), to the act of February 4, 1887 (24 Stat. 386, Chap. 104, § 20), that no contract, receipt, rule, or regulation shall exempt an interstate carrier from the liability thereby imposed, does not forbid a limitation of liability, in case of loss, to a valuation agreed upon in the contract of shipment, for the purpose of determining which of two alternative rates shall apply to the shipment.
2. Where, in the course of transportation of live stock by a common carrier, inferior animals are substituted for some of those originally shipped,

a conversion on the part of the carrier may be presumed; and although the substitution occurs in the course of an interstate shipment, made under a contract limiting liability to an agreed valuation for each animal shipped, a recovery of damages based on the actual value of the animals would be authorized, unless the explanation offered by the carrier is sufficient to negative the idea of a wrongful conversion, and of negligence amounting to gross or wanton negligence on the part of the carrier. Whether the explanation is sufficient is a question for determination by the jury.

DECIDED JULY 21, 1914.

Attachment; from city court of LaGrange—Judge Harwell. November 29, 1913.

C. V. Truitt Company sued out an attachment against the Nashville, Chattanooga & St. Louis Railway, and filed a declaration alleging, that the plaintiff delivered to the defendant a car-load of mules, to be transported from Nashville, Tennessee, to LaGrange, Georgia; that one of the mules died in transit, and its value was $250; and that three of them were, without the knowledge or consent of the plaintiff, exchanged or substituted in transit for three others, which were $200 less in value than the three for which they were substituted. It was alleged that the railway company was guilty of negligence because the floor of the car in which the mules were placed was in a wet and slippery condition, and the amount of sawdust or other material placed on it was not sufficient to dry it or prevent the feet of the mules from coming in contact with it, and they could not safely stand thereon; that unusual and unnecessary force was used in the effort to couple the car to the engine, and that in starting off with the car after it had been coupled, the engine gave an unusual and unnecessary jerk; that in stopping for the purpose of switching the car to the yards, the engine was stopped too suddenly, and the unusual and unnecessary suddenness with which it was stopped caused "a jerk and bump" to the car, and in starting off from this position the engine started too suddenly and too rapidly, and gave an unusual and unnecessary jerk to the car; that by reason of the sudden starting and stopping and jerking of the car, one of the mules fell down, and, because of the slippery condition of the floor, was unable to get up again; that after the mule had been thrown down, the car was carried back and unloaded in one of the stockpens of the railway company, with the exception of this mule, which was allowed to remain all night in the car, exposed to extremely cold weather, and was not

removed until the next morning; and that the result of all of this negligence was the loss of the mule by death. It was alleged, as to the three mules substituted for mules of the plaintiff, that on arrival of the car at LaGrange the plaintiff called the attention of the agent of the delivering railroad company to the substitution, and had a written exception noted, and the agent agreed to have reparation made. By amendment it was alleged, as to the valuation expressed in the bill of lading (and relied upon by the defendant as limiting its liability), that this valuation was not agreed on in order to secure a lower rate or any particular rate, but was stated merely in a printed bill of lading used generally by the defendant without regard to the actual value of the stock shipped, and that the printed values in this bill of lading were not in fact the reasonable value of the stock shipped, and were never understood to be the real value, either by the plaintiff or the defendant.

The defendant, in its answer, denied the allegation as to negligence and as to the substitution of three inferior mules, and pleaded that if it was liable for the loss of the mule that died, the contract of shipment limited its liability to $100, it being stated in the bill of lading, under which the shipment was made from Nashville, Tennessee, to LaGrange, Georgia, that in consideration of the acceptance by the railway company of the reduced rate of $86 per car, instead of the tariff rate of $172 per car, it is agreed by the shipper that "should loss or damage occur for which the [railway company]. may be liable, the value at the place and date of shipment shall govern the settlement, in which the amount claimed shall not exceed, . . for horses and mules, each $100, which it is agreed [is] as much as such animals as herein agreed to be worth are reasonably worth." The defendant pleaded further that it was released from liability by the stipulation in the bill of lading that the shipper "hereby assumes all risk of injury which the animals or any of them may receive in consequence of either or any of them being wild and unruly or weak, and of the escape of any portion of said stock, or by maiming each other or themselves, or in consequence of heat or suffocation or other ill effects of being crowded in the cars." It was further pleaded that the plaintiff had failed to give the written notification as to the alleged loss or damage as required in the contract.

The trial resulted in a verdict in favor of the plaintiff for

$119.50. The defendant made a motion for a new trial on the usual general grounds only, the motion was overruled, and it filed a bill of exceptions. The plaintiff also made a motion for a new trial, which was overruled, and it filed a cross-bill of exceptions. The plaintiff's motion for a new trial was upon the usual general grounds, and upon the special ground that the court erred in charging the jury that as a matter of law, the plaintiff was bound by the valuation expressed in the contract of shipment, and could not recover more than the sum of $100 for each horse or mule; and that, it being admitted by the plaintiff that it accepted the substituted mules and sold them, and that each was worth more than the $100 valuation expressed in the contract of shipment, the plaintiff could not recover for any difference in price between the mules shipped and the mules so substituted, and the only question in the case that the jury might consider was whether or not the plaintiff was entitled to recover anything for the mule which it was alleged had died. It was contended that the court erred in these instructions because they were not authorized by the evidence, and because, under the evidence, the question of damages resulting from the alleged substitution should have been submitted to the jury; and further "because the contract of shipment and the value admitted by the plaintiff, in the pleadings, of the three substituted mules actually received by the plaintiff did not preclude a recovery by the plaintiff of the damages suffered by reason of the substitution of said mules."

*Tye, Peeples & Jordan, E. T. Moon,* for plaintiff in error.
*Hatton Lovejoy,* contra.

WADE, J. (After stating the foregoing facts.) Since the controlling question in this case is involved in a consideration of the points raised by the cross-bill of exceptions, it would be futile to consider or discuss the sole question raised by the main bill of exceptions, sued out because the court refused to grant the defendant's motion for a new trial, which was based entirely on the alleged insufficiency of the evidence to sustain the verdict. Under the ruling hereinafter made on the cross-bill, the case must go back for another trial, and the evidence adduced at that trial may be radically different from that contained in the present record.

1. Since the Carmack amendment, of June 29, 1906, has received interpretation from the Supreme Court of the United

States, the rule heretofore maintained in Georgia, under the decisions of our Supreme Court and of this court, as exemplified in the cases of *Louisville & Nashville Railroad Co.* v. *Tharpe,* 11 *Ga. App.* 465 (75 S. E. 677), and *Central of Georgia Railway Co.* v. *Hall,* 124 *Ga.* 322 (52 S. E. 679, 4 L. R. A. (N. S.) 898; 110 Am. St. R. 170, 4 Ann. Cas. 128), as to limitation of liability by a common carrier by means of a contract prearranging the amount of damages, has been materially qualified. In the case of Adams Express Co. v. Croninger, 226 U. S. 509 (33 Sup. Ct. 153, 57. L. ed. 314, 44 L. R. A. (N. S.) 257), the Supreme Court says that it is "an established rule of the common law · .   .   that such a carrier may by a fair, open, just, and reasonable agreement, limit the amount recoverable by a shipper in case of loss or damage, to an agreed value, made for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk." Also, in the same case, the court holds that under the Carmack amendment, inquiry as to the actual value of an interstate shipment is not vital to the fairness of a stipulation in the carrier's receipt, limiting its liability to an agreed or declared value, where it appears from the receipt, as well as from the published rates on file with the interstate-commerce commission that the rate charged was based upon value; and it is held that a shipper's knowledge that the carrier's rate was based upon the value of the shipment is to be presumed, where this plainly appears from the terms of the bill of lading and from the published rates on file with the interstate-commerce commission. See also Chicago, St. Paul, Minneapolis & Omaha Railway Co. v. Latta, 226 U. S. 519 (33 Sup. Ct. 155, 57 L. ed. 328); Missouri, Kansas & Texas Railway Co. v. Harriman, 227 U. S. 657 (33 Sup. Ct. 397, 57 L. ed. 690), and Chicago, Burlington & Quincy Railway Co. v. Miller, 226 U. S. 513 (33 Sup. Ct. 155, 57 L. ed. 323). All of these cases sustain the doctrine that the shipper and the carrier of an interstate shipment are not forbidden, by the provisions of the Carmack amendment, to limit by contract the carrier's liability to an agreed value, made to adjust the rate. In Kansas City Southern Railway Co. v. Carl, 227 U. S. 639 (33 Sup. Ct. 391, 57 L. ed. 683), the court held that a limitation of liability, in case of loss or damage, to a valuation agreed upon for the purpose of determining which of two alternative rates shall apply to a particular shipment is not forbidden by the Carmack amendment, and in Missouri, Kansas &

Texas Railway Co. *v.* Harriman, supra, it was held, as to a contract for the shipment of live stock, that a stipulation of the character referred to was not forbidden by the Carmack amendment, even though the true value of the animals greatly exceeded the agreed valuation, where it was not claimed that the carrier was informed of their value or quality, and it was held that the valuation named in the shipping contract was as much an agreed valuation as though the shipper had stated the value on inquiry.

From a consideration of these rulings of the Supreme Court of the United States, it does not appear to be material that no special inquiry was made by the carrier at the time the contract of shipment was entered into, since it nowhere appears that the carrier had knowledge of any great discrepancy between the actual value of the mules and the limiting valuation placed thereon as a basis for the lower of two rates allowed to the shipper. In fact, in the case of Chicago, Burlington & Quincy Railway Co. *v.* Miller, supra, it appears that the bill of lading placed a value upon a certain stallion of $100, which the plaintiff claimed was actually worth $2,000, and that the limitation stipulated in the contract was void under a statute of Iowa, the State in which the contract was made, and was also illegal and invalid under a clause in the constitution of Nebraska, the State in which the loss occurred and in which the case was tried, and yet the Supreme Court sustained the contract as written, and declared that Congress had manifested a purpose to take possession of the entire subject of liability of a carrier by railroad for interstate shipments, and that the regulations contained in the act of 1887, as amended by the act of June 29, 1906, had superseded all State regulation upon the same subject.

To us it appears that the evidence clearly established the existence of two different lawful rates, not only on file with the commission, but also plainly set forth in the bill of lading issued by the carrier, which limited the valuation of each mule to $100, for the purpose of applying the lower of two rates named in the contract. As decided in the case of Adams Express Company *v.* Croninger, supra, it is immaterial whether or not there was any discussion or oral agreement between the carrier and the shipper, or the agents of the shipper, since, as was there held, inquiry as to the actual value of an interstate shipment is not vital to the fairness of such a stipulation, where it plainly appears from the receipt, as well as from the published rates on file with the interstate-commerce com-

mission, that the rates were based upon value. As stated above, not only did it appear, from the evidence, that the freight rate of $86, charged for this shipment, as the rate applicable under contracts limiting liability, and the rate of $172, applicable in the absence of such a contract, were published rates filed with the interstate-commerce commission, but the contract itself set forth explicitly that the "Tariff rate on this shipment from Nashville, Tennessee, to LaGrange, Georgia, is $172 per car," and that "in consideration of the transportation by the carrier of this carload of mules from Nashville, Tennessee, to LaGrange, Georgia, at the rate of $86 per car, the same being a special rate, lower than the tariff rate charged when this contract is not executed," the shipper relieves the carrier, of certain liabilities, and also agrees that should loss or damage occur for which the carrier may be liable, the value at the place and date of shipment shall govern the settlement, and the amount claimed shall not exceed $100 each for horses or mules. "A contract of carriage limiting the liability of the carrier for loss or injury regardless of actual loss must be based on a sufficient consideration. Mere agreement for transportation between parties to a shipment will not support an agreement to limit the carrier's common-law liability; an independent consideration, such as a reduced freight rate, or an agreement to transport over its line and that of a connecting carrier, being necessary. The shipper must be given an opportunity to choose between the common-law right and rate and the special contract rate and limited liability." 1 Moore on Carriers (2d ed.), 442-3.

2. The common-law rule made carriers practically insurers of property while the property was being transported by them; and, from public policy, they are not allowed to contract to exempt themselves from loss arising from the negligence of their agents and employees. But this rule, from the necessity of the case, has been in a measure relaxed so far as relates to the carriage of live stock, and the carrier is not an insurer against injuries resulting from the inherent nature or propensities of the animals themselves, and not from negligence on the part of the carrier. Of course, the carrier can not exempt itself by contract from the consequences of a tortious act committed through its agents or employees. "A railroad company undertaking to transport live stock is liable for the negligence of its agents and servants, but not as insurer." 2 Moore

on Carriers (2d ed.), 818. "The principle is well established that a common carrier may be held in trover when· it is guilty of misfeasance, although the wrong may have been unintentional." Id. 275. "The general rule is that a carrier is not liable in conversion for mere non-feasance, although he may be liable for negligence. Thus, trover will not lie for the mere omission of the carrier; as, where the property has been lost or stolen through his negligence and so can not be delivered to the owner, and the inability to deliver does not arise from any act of the carrier. Mere non-delivery by a common carrier will not constitute a conversion, nor will a refusal to deliver, on demand, if the goods have been lost through negligence, or have been stolen. A conversion implies a wrongful act, a misdelivery, a wrongful disposition or withholding of property. There must be proof of a wrongful disposition or wrongful withholding." Id. 284-5, and cases there cited.

It is settled in this State that "loss of goods by a wrong delivery, negligently made by the carrier, is a conversion, for which the carrier is liable to account at the full value of the goods," and does not come within the terms of a special contract fixing a limited valuation upon the goods at the time of shipment, in consideration of a lawful reduction of the freight rate. *Savannah, Florida & Western Ry. Co.* v. *Sloat*, 93 *Ga.* 803 (20 S. E. 219), and *Atlantic Coast Line Railroad Co.* v. *Goodwin*, 1 *Ga. App.* 351 (57 S. E. 1070). In these two cases inanimate freight was shipped. In *Georgia Southern & Florida Ry. Co.* v. *Greer*, 2 *Ga. App.* 516 (58 S. E. 782), it was held, that "A carrier of live stock can, by special contract, be released from liability for injuries to such stock arising from named causes, and can as to these and all other incidents of transportation, by such contract, stipulate for liability only in the event of damage and loss by the gross negligence of its servants." As held in several decisions of the United States Supreme Court, hereinbefore referred to, and the recent case of Atchison, Topeka & Santa Fé Railway Co. *v.* Robinson, 233 U. S. 173 (34 Sup. Ct. 556), the effect of the Carmack amendment to the Hepburn act was to give to the Federal jurisdiction control over interstate commerce, and to make supreme the Federal legislation regulating liability for property transported by common carriers in interstate commerce; and since it appears that Congress intended to take possession of the entire subject of interstate shipments, to the exclu-

sion of the various States, the decisions of the United States Supreme Court which allow full force and effect to contracts limiting liability, where based upon a proper consideration (as, for instance, the lower of two lawful rates), not only necessitate a more literal enforcement of the terms of such contracts than was required by the Georgia courts before the construction by the United States Supreme Court of the Carmack amendment to the Hepburn act, but may even eventually narrow the limits of what has been heretofore held to be a conversion under the law.

It is conceded by able counsel for the railroad company that a carrier can not actually convert goods and be protected by a valuation clause; since "where the carrier has converted the goods, he will be deemed to have thereby abandoned the contract of shipment, and he can not thereafter insist on a stipulation that his liability shall be limited to a certain sum at which the goods are valued; nor can he do so where the negligence which occasioned the loss was wanton or wilful." 1 Hutchinson on Carriers (3d ed.), § 432. "He can not, of course, exonerate himself from the consequences of the fraud or felony either of himself or of his servants." Id. § 418. And "a contract can not avail if the act of the carrier or his servants amounts to misfeasance. . . The act which will deprive the carrier of the benefit of a contract for limited liability fairly made must be an affirmative act of wrong-doing, not merely ordinary neglect in the course of the bailment. It need not necessarily be intentional wrong-doing, but the mere omission of ordinary care in the safe-keeping and carriage of goods is not the misfeasance intended by the authorities." Id. § 478. "Where there is a suit for a conversion, the wrong-doer can not take advantage of an agreed valuation of the property in order to lessen the amount of his liability." *Georgia Southern & Florida Ry. Co.* v. *Johnson,* 121 *Ga.* 231 (48 S. E. 807). In *Georgia Railroad Co.* v. *Keener,* 93 *Ga.* 808 (21 S. E. 287, 44 Am. St. R. 197), where some of the goods were stolen, and there was no evidence to show how or under what circumstances the theft occurred, the court said: "Presumptively the loss was occasioned by the company's negligence, and this being so, it was liable for the full value of the goods so lost." It appears, however, that in that case the stipulation by which it was sought to limit the liability of the shipper to a stated valuation was not valid, since there was no attempt to esti-

mate the value of the goods, whereas the contract in the instant case is a good and valid contract, under the recent holdings of the United States Supreme Court referred to above.

We may conclude that evidence of an actual conversion or of some wrongful act, or of wilful or wanton negligence would be necessary, under the present state of the law, before a contract limiting liability on an interstate shipment, by a fixed agreement as to value of the shipment, would be construed as furnishing no security against the collection from the carrier of the actual value of live stock, where loss occurred; and though it may be conceded that a failure to deliver at the point of destination would raise a presumption against the carrier that a conversion had occurred, the presumption is not conclusive, but may be overcome if it definitely appears that such loss resulted from negligence, not amounting to gross negligence, in which event the contract limitation would apply, and the recovery be determined thereby. In the absence of any evidence or explanation from the carrier, and upon proof that three inferior mules had been substituted for three others delivered to the carrier for transportation, the plaintiff was entitled to recover the actual value of the mules as shown by proof, less the value of those substituted and which were accepted by the consignee under protest. On the other hand, if no substitution occurred, there could be no recovery for such difference; or if the substitution occurred through no wrongful, wanton, or wilful act of the carrier or its agent, but through negligence only, not amounting to gross or wanton negligence, then the recovery to which the plaintiff would be entitled would be limited by the contract of shipment to the agreed valuation of $100 per mule, in consideration of the lower rate charged; and since the mules actually received were of greater value than this, there could be no recovery on account of the substitution.

From the evidence for the railroad company, the jury would have been authorized to infer, had they wished to believe this testimony rather than that in behalf of the plaintiff, that the mules originally loaded on the car at Nashville, Tennessee, were the actual mules delivered to the plaintiff at LaGrange; since that testimony showed that the identical mules loaded at Nashville were unloaded on the same day at the same place, and, after the removal of one which had been injured, the remaining 28 mules were reloaded

at Nashville the next day; that the car was sealed before it left Nashville, and was sealed when it reached Atlanta; that the seal on the car was broken in Atlanta, and the mules found therein were unloaded and these identical mules afterwards reloaded, and the car was again sealed, and the shipment forwarded to LaGrange, where the seal was again broken and the mules were unloaded, and the claim was made by the plaintiff that three inferior mules had been substituted for three of the mules shipped. Under this testimony the jury could have found that no substitution had been effected, had they seen fit to believe the circumstantial evidence going to show that no substitution occurred, either by accident or intention; but that if there was a substitution, it occurred between the time of the sale of the mules to the consignee and the time when the drove of mules was delivered to the carrier for transportation.

Also, the jury might have determined that there was no wilful, wanton, or wrongful conversion on the part of the carrier, its agents or employees, and that if there was a substitution, it did not occur from any such cause, but possibly was the result of accidental or negligent intermingling of the mules with other mules at the stock-yards in Nashville or Atlanta, without any tortious act or intention on the part of the carrier, and without profit or advantage to it, and without even gross negligence on its part, and possibly on account of the natural propensities of the animals themselves, which the contract was intended to guard against. The loss raised a presumption of a conversion, sufficient to sustain the verdict, but the explanation or the proof offered in behalf of the carrier might have convinced the jury, for aught we know, that there was no bad faith or gross negligence on the part of the carrier, its agents or employees; in which event the limitation as to value, fixed by the contract, would have applied; or if the jury believed there was no substitution, they might have so found, under the evidence.

On the other hand, if the jury had believed there was a substitution, and if in their opinion the explanation made by the carrier did not rebut the presumption arising from such substitution, they might have found that there was a wrongful, wilful, or wanton conversion, or a conversion brought about by gross negligence, and

might in such event have rendered a verdict against the carrier for such difference in value between the mules shipped and the mules received as the evidence might have shown.

It follows that the court erred in withdrawing from the consideration of the jury the entire question as to the substitution of three certain mules for three others of higher value, and the whole matter should have been submitted to the jury, under a proper charge instructing them as to their consideration of the contract of af-freightment and the explanation offered by the railroad company to account for the loss by substitution, if such a loss actually occurred.

*Judgment on cross-bill of exceptions reversed; main bill of exceptions dismissed.   Roan J., absent.*